19 Cal.2d 368 (1942)
MARIE A. WRIGHT, Appellant,
v.
C. L. BEST, Respondent.
Sac. No. 5393. 
Supreme Court of California. In Bank. 
Feb. 3, 1942.
 Gilford G. Rowland, Wilson Craven and Rowland & Craven for Appellant.
 A. J. Just, Louis V. Skinner and Fitzgerald, Abbott & Beardsley for Respondent.
 EDMONDS, J.
 The appellant asserts that, as the owner of a water right by appropriation, she is entitled to enjoin C. L. Best from polluting Rock Creek in connection with certain mining operations, and also to recover from him damages for such pollution. The judgment from which she has appealed is based upon findings that she does not own the *373 water right claimed by her, and also that any rights which she acquired from her predecessors in interest are subject to an agreement made by them and The Ruby Gold Gravel Mining Co.
 After alleging ownership of the property known as the Kennedy Ranch and the right to take water from Rock Creek, in Sierra County, the appellant's complaint charges that, in the spring of 1937, and upon occasions since that time, the respondent has dumped and is now discharging, mine tailings into the creek, rendering the water wholly unfit for domestic or agricultural purposes. By answer, the respondent denied these allegations, and as a separate defense, pleaded a contract made in 1883 by The Ruby Gold Gravel Mining Co., his predecessor in interest, and Henry H. Kennedy, the then owner of the land and water right to which the appellant claims title, granting it the right to run mining debris into Rock Creek. Upon these issues the court heard extensive evidence which may be summarized as follows:
 The Kennedy Ranch comprises 47 acres of land located near the mouth of Rock Creek, but not riparian thereto. In 1852, its owner appropriated water from that stream by means of a small diversion dam located approximately one- half mile above the ranch. From the dam the water was carried through a flume and ditch to the ranch. These water works are now in use by the appellant.
 In 1875, Kennedy bought the ranch, with the right to take water from the creek through the ditch and flume. He and his family lived upon the property from 1875 to 1915, and during that period used the water for domestic, culinary and household purposes and for the irrigation of crops of hay, fruit and vegetables.
 About the time Kennedy became the owner of the ranch, The Ruby Gold Gravel Mining Co. owned and operated patented mining claims, known as the Guatamala and Guatamala Extension, located some five miles above it on Rock Creek and tributary streams. In 1883, and for some time before, the mining company had been polluting the waters of the creek with tailings and mining debris taken from these claims. Kennedy filed suit to enjoin the pollution. For the purpose of compromising and settling the litigation, Kennedy and the mining company entered into a written agreement which was recorded seven months later. *374
 The material provisions of this agreement are as follows: Kennedy granted to the mining company the right to run gravel, dirt and mining debris from any of its mines into Rock Creek until April 1, 1884, and released the company from any and all damage caused to him or his properties thereby. If the company polluted the water after April 1, 1884, it agreed to pay Kennedy $680, upon the payment of which sum it would acquire the right to deposit gravel in the stream from any mine operated by it until April 1, 1885. If the company polluted the stream in any year after April 1, 1885, it agreed to pay Kennedy the sum of $600 for each year in which such pollution occurred, the payment of which sum or sums would release it from all damage done to Kennedy or his property on account of such pollution during the year for which payment was made. If and when $3,000 was paid to Kennedy, then and thereafter the company should have, in so far as Kennedy was concerned, a perpetual right to pollute the waters of Rock Creek. The contract further provided that, in the event of a sale or conveyance by either party of any property to which the agreement related, such sale or conveyance should be expressly made subject to its terms, and that it "shall be binding upon, and available to the successors in interest ... of both parties. ..." This agreement was never formally assigned or transferred to any of the successors in interest of the land then owned by the mining company.
 One year later, 1884, the mining company acquired by purchase an adjoining property known as the Garnet Claim. Some time thereafter, the company abandoned its mining operations, and although other owners mined the claims in later years, the only evidence concerning the resumption of pollution of the stream is that this occurred at intermittent times. The record shows no substantial and continuous pollution by successors in interest of The Ruby Gold Gravel Mining Co. until shortly before the commencement of the present action. But for many years, Kennedy continued to farm the ranch, using the unpolluted waters of the creek for both household and irrigation purposes. In 1915, he sold the property, but successive owners made similar use of the water, raising crops of hay, fruit and vegetables.
 The appellant and others bought the ranch and the appurtenant water right in 1926. In the next 10 years these owners prospected the land for minerals and conducted no *375 farming operations. However, the waters of Rock Creek were continuously used for household and domestic purposes and also for the irrigation of lawns, shrubs and some vegetables.
 In 1933, the respondent acquired through mesne conveyances the mining property formerly owned by The Ruby Gold Gravel Mining Co., including the Guatamala, Guatamala Extension and Garnet claims. Thereafter, he purchased from others the Jade, Topaz, Irene and Opal claims, all of which are adjacent and contiguous to them. The entire group is commonly referred to as the "Ruby Mine."
 The respondent's operations, which commenced in 1933, are dual in nature, consisting of quartz mining and underground placer mining. Upon the Garnet Claim, there is a stamp mill for quartz ore and a gravel washing plant. The quartz is mined upon the Guatamala Claim; the gravel production comes principally from the Topaz Claim, although a small part of it is obtained from the Guatamala Extension.
 It was not until 1936 that the pollution of Rock Creek from the Ruby Mine became noticeable. During the summer months of that year great quantities of debris were discharged from the mine into the stream, and the pollution continued uninterruptedly until 1938, when the appellant, who was then the sole owner of the Kennedy Ranch, filed the present action.
 In addition to the mining properties owned by the respondent, there are a number of other mines, located within the Rock Creek area above the Kennedy Ranch, which, when operating, also dispose of mine tailings in the creek. In addition to the appropriative right in Rock Creek, the appellant also owns and uses on the Kennedy Ranch a right to take water from Woodruff Creek, which, according to the respondent, furnishes an adequate supply of clear and unpolluted water for her domestic and irrigation needs.
 From these facts, the trial court found that the appellant is the owner of the Kennedy Ranch, having acquired title with notice of the 1883 agreement; that the entire consideration ($3,000) called for by that agreement was paid; and that the respondent has succeeded to any rights created by it. Other findings of the court are that the appellant's predecessors in interest were the owners of a water right in Rock Creek, which right is subject to the terms of and limitations imposed by the agreement; that she does not own the water right claimed by her; that the respondent is discharging, and threatens to continue to discharge into Rock Creek, *376 quantities of clay, gravel and mill tailings, but that the water is not thereby polluted nor rendered totally unfit for domestic, household or agricultural purposes; and that appellant owns and is now using a supply of clear and unpolluted water from Woodruff Creek which is adequate for domestic and irrigating purposes. From these findings, the court concluded that the respondent is the owner of a perpetual right to pollute the waters of Rock Creek and denied the appellant injunctive or other relief.
 In attacking the judgment against her, the appellant contends that the findings are inconsistent and uncertain. One cannot determine, she says, whether the court decided that in the years between 1926 and 1937 she and her co-owners lost the right to take water from Rock Creek because of acts occurring during that time, or whether she now owns the water right claimed by her subject to the agreement made in 1883. But she takes the position that, under one theory of the case, she may recover without quieting her title to the water right, because one in possession may maintain an action to abate a nuisance which injuriously affects his enjoyment of possession. The appellant also asserts that the findings concerning title to the water right, the non-pollution of the water of Rock Creek, and the payment of the consideration provided for in the 1883 contract are either contrary to, or not supported by, the evidence.
 Other points presented challenge the trial court's conclusion of law that the respondent has succeeded to the rights of the mining company under the 1883 agreement. That contract, she argues, creates neither an easement appurtenant nor a covenant running with the land and, assuming that an easement was created, the trial court should have defined the parcel of land to which it is appurtenant and confined the respondent's rights to that land. Also, the fact that she has a right to take water from Woodruff Creek is not a defense to her action but may only be urged in diminution of damages.
 In support of the judgment, the respondent asserts that the appellant has not established her ownership of the right which she seeks to protect by injunction; that she has not proved facts entitling her to injunctive relief and that the balance of convenience is against her position. He also maintains that the challenged findings are supported by the evidence and that the court drew correct conclusions of law from them. *377
 [1a] The finding upon the issue of the appellant's property rights is that, since the year 1926, she and her predecessors in title have not owned, possessed or used a water right such as is alleged in her complaint. But there is uncontradicted evidence to the contrary. [2] In her complaint, she alleged that she and her predecessors in interest have owned a right in the waters of Rock Creek, acquired in 1852 by diversion and continuous use upon the Kennedy Ranch for irrigation and domestic purposes. This is a sufficient averment of the ultimate fact of ownership (Gartlan v. C. A. Hooper & Co., 177 Cal. 414 [170 P. 1115]; Chrisman v. Southern California Edison Co., 83 Cal.App. 249 [256 P. 618]; 26 Cal.Jur. 519, 520). [1b] In proof of that allegation, the appellant introduced in evidence a chain of title with respect to the water right showing that, through successive conveyances from the year 1856, the right was finally conveyed by deed to her as appurtenant to the Kennedy Ranch.
 In addition to the record title, the appellant proved, by several witnesses, an uninterrupted beneficial use of the water by the successive owners of the ranch. Although the extent of the right, as originally acquired, is not specifically shown, several of the deeds in the chain of title describe the flume and ditch as having a capacity of 300 miner's inches, and a licensed engineer, called as a witness on behalf of the appellant, testified that the capacity of the flume is approximately 240 miner's inches. Moreover, inasmuch as this is a suit to enjoin the pollution of water beneficially used for more than 50 years, the quantity of water to which the right attaches is not material, for substantial pollution would destroy the usefulness of even a small amount of it. In the absence of any evidence to the contrary, the records offered in evidence and the corroborating testimony proved ownership of a water right acquired by appropriation and preserved by beneficial use, and which, by successive conveyances, has become appurtenant to the Kennedy Ranch.
 [3] Equally unsupported by the evidence is the finding that the waters of Rock Creek were not polluted nor rendered wholly unfit for domestic, household and agricultural purposes. Admittedly, respondent has dumped, and is dumping, great quantities of sand, clay, gravel and mill tailings into the stream. According to the testimony of the respondent's mine superintendent, the quantity of debris deposited in the *378 creek varied from 16,000 tons in 1937 to between 30 and 40,000 tons in 1938. Several witnesses, including persons who resided on the Kennedy Ranch, testified that in the years 1936 and 1937, the water was muddy and discolored by slickens from the mines and that it could not be used for either drinking or irrigation purposes. There is evidence that when the water was sprinkled on lawns, plants, and clothes or used on dishes, the debris would adhere to them and coat them, giving them the appearance of being painted gray. Other testimony shows that in 1938, when the water was used to generate power on the ranch, the debris would clog up pipe lines and ditches and wear out power machinery, and during 1936 and 1937, the pollution was so great that the ditch would fill up twice a year, requiring a week for two men to clean it. These statements were further corroborated by the testimony of Walter Techow, a chemist, who made an analysis of the waters of the creek and found that the deposited tailings would penetrate into the soil for a depth of a few inches, causing any percolation to entirely cease.
 The only evidence to the contrary was given by a mining engineer, who testified that, according to a test made by him of the water in the creek, the turbidity of the stream was such that fish and plant life could exist in it. His test was conducted, however, at a time when the respondent's stamp mill was not operating. It is not directly contradictory of that offered by the appellant, which compels a finding that the waters of Rock Creek were substantially polluted and rendered unfit for the appellant's reasonable household and irrigating uses.
 [4] Considering the respective rights of the parties under these circumstances, it is an established rule in this state that an appropriator of waters of a stream, as against upper owners with inferior rights of user, is entitled to have the water at his point of diversion preserved in its natural state of purity, and any use which corrupts the water so as to essentially impair its usefulness for the purposes to which he originally devoted it, is an invasion of his rights. Any material deterioration of the quality of the stream by subsequent appropriators or others without superior rights entitles him to both injunctive and legal relief (Phoenix Water Co. v. Fletcher, 23 Cal. 481; Hill v. Smith, 27 Cal. 476; Antioch v. Williams Irrigation Dist., 188 Cal. 451 [205 P. 688]; Joerger v. Pacific Gas & Elec. Co., 207 Cal. 8 [276 P. 1017]; *379 26 Cal.Jur. 188, 189; Wiel, Water Rights, 3rd Ed., vol. 1, pp. 561-565). The respondent does not assert a right to pollute the waters of Rock Creek as a riparian owner, prior appropriator, or by way of prescriptive user. He bases his claim entirely upon the 1883 agreement, and his right therefore depends upon whether that agreement, under the law applying to interests in real property, is anything more than a personal covenant, binding only as between the original parties.
 [5] As a preliminary question concerning this contract, it is necessary to determine whether the evidence sustains the finding that the entire consideration of $3,000 was paid, for under the express terms of the writing, the existence of any perpetual right to pollute the stream is conditioned upon the payment of that amount. Upon that issue, the record includes the testimony of E. C. Kennedy, the son of H. H. Kennedy, who declared that his father told him he had received $3,000 from the mining company. This testimony was corroborated by that of Louis Fortier, an old- time resident of Sierra County, who declared Kennedy told him that "he [Kennedy] had received all his money from the settlement he had made with them." These declarations of a deceased predecessor in title, having been made in relation to the property before he parted with his interest therein, constitute admissible hearsay evidence and are binding upon his successors in title either as declarations against pecuniary interest or as in the nature of vicarious admissions (Code Civ. Proc., 1853; Code Civ. Proc. 1849). Although such evidence is not entirely satisfactory, it will support a finding, particularly in the absence of any showing to the contrary. Moreover, the transaction to which the evidence was directed, occurred over a half century ago, and other and better evidence was undoubtedly difficult, and perhaps impossible, to obtain.
 [6] The appellant objects to the testimony of E. C. Kennedy on the ground that the conversation with his father attested to by him occurred over 50 years before at a time when he was a small boy; she advances a similar objection to the testimony of Fortier, claiming that it contains certain inconsistencies and evidences a faulty memory on his part. Such objections do not go to the admissibility or sufficiency of the evidence, but rather to the weight of the testimony and the credibility of the witnesses, matters wholly within *380 the exclusive province of the trier of fact, whose determination upon them will not be disturbed by an appellate court.
 [7] Considering the express language of the agreement which the parties signed, it cannot be seriously argued that they intended to make a personal contract in the nature of a covenant not to sue, the force of which would automatically cease upon the conveyance by either of them of the property to which the contract related. The contract clearly and unambiguously grants to The Ruby Gold Gravel Mining Company the right to deposit tailings in Rock Creek from any of its mines forever, the right thus granted to be available to, and binding upon successors in interest and their respective properties. Undoubtedly, a perpetual right was intended. The difficulty lies in determining the legal nature of that right and whether it is one recognized by the law.
 Pointing out that a water right by appropriation is independent of ownership and possession of land and subject to sale separately from it (26 Cal.Jur. 103; Wiel, Water Rights, 3rd Ed., vol. 1, p. 582), the respondent contends that the agreement constituted a sale of the quality of the water in Rock Creek to the mining company. According to his argument, an appropriative water right includes both quantity and quality, either of which is separately alienable. Upon that premise, he asserts that the appellant's predecessor in interest, having conveyed his right to a flow of clear and unpolluted water, no such right descended to appellant.
 This argument must be rejected for several reasons. In the first place, the agreement itself does not contemplate a sale of quality. The mining company acquired no interest in the quality of the water under the contract; it was merely given the right to corrupt a quality enjoyed by the appellant's predecessor in interest. Moreover, quality, unlike quantity which is a measurable element, is not a subject of sale. [8] Finally, if respondent's contention were accepted, his right must be regarded as forfeited. The transferee of an appropriative right becomes vested with the right as such. An appropriative right is lost by a non-beneficial user for five consecutive years. (Civ. Code, sec. 1411; Smith v. Hawkins, 110 Cal. 122 [42 P. 453]; Lindblom v. Round Valley Water Co., 178 Cal. 450 [173 P. 994]; Bazet v. Nugget Bar Placers, Inc., 211 Cal. 607 [296 P. 616].) Consequently, if the mining company obtained an appropriative right to quality under the agreement, any such right has now become *381 lost by continuous non-user for several years as shown by the evidence.
 [9a] Although the agreement does not constitute a sale of the quality of the water of the stream it may still be available as a defense to the respondent, if it may be legally construed as creating some right which, by reason of attachment to the claims owned by the mining company passed to him by the conveyance of those claims. The respondent contends that the effect of the agreement is to create an easement burdening the Kennedy Ranch for the benefit of the Ruby Mine which is binding upon the appellant by reason of the constructive notice afforded by the recordation of the grant.
 [10] An easement involves primarily the privilege of doing a certain act on, or to the detriment of, another's property. To the creation of an appurtenant easement, two tenements are necessary, a dominant one in favor of which the obligation exists, and a servient one upon which the obligation rests. [9b] Applying these principles to the facts of the present case, the grant to the Ruby Mining Company to pollute the waters of Rock Creek cannot be said to have created an easement in the non-riparian Kennedy Ranch, for the granted privilege involves no use of the land, or restriction of its use. If the grant is regarded as one to deposit tailings upon the ranch, Kennedy could not have lawfully closed the diversion ditch leading to his land under the rule that a servient owner may not interfere with the exercise or enjoyment of an easement. Certainly no such result was contemplated by the parties for the mining company desired only to discharge tailings into the stream; their ultimate place of deposit was of no interest to it. Moreover, the fact that Kennedy was the owner of an appropriative right, severable and alienable from the land to which it is appurtenant, is most significant. Under these circumstances, and considering the express language of the grant, it may not reasonably be construed as creating an easement upon the land.
 The respondent cites several cases to the effect that a grant to a mining company of the right to discharge refuse material into a stream results in the creation of an easement in the land of the lower owner (Luama v. Bunker Hill & S. Mining & Concentrating Co., 41 Fed.2d 358; Gross v. Bunker Hill & S. Mining & Concentrating Co., 45 Fed.2d 651; Johnson v. Armour & Co., 69 N. D. 769 [291 N.W. 113, 127 A.L.R. 828]; Brush v. Lehigh Valley Coal Co., 290 Pa. 322 *382 [138 Atl. 860]; 127 A.L.R. 828, 838, 839). These decisions, however, involve grants by lower riparian owners. Since a riparian right is inseparably annexed to the adjacent riparian land as part and parcel of it (25 Cal.Jur. 1068, 1069), any grant by the riparian owner which affects his water right necessarily burdens his land. Accordingly, it is logical to hold that such a grant creates an easement in the land. The nature of the right of a non-riparian owner compels a different construction of the grant to The Ruby Gold Gravel Mining Co. and a determination that no easement in the Kennedy Ranch was contemplated by the parties or acquired by the grantee.
 [11] The right clearly intended by the agreement is an easement annexed to the appropriative water right enjoyed by appellant, the waters of the creek to be used as a conduit to carry off the debris therein deposited from the claims worked by The Ruby Gold Gravel Mining Co. Although no authority has been cited for or against the proposition that an easement may be attached to a water right, there is no legal or practical objection to the creation of such an incident. A prescriptive right to pollute a watercourse may be acquired as against lower riparian users and their successors in interest provided the deterioration in quality is not so great as to constitute a public nuisance (see cases cited in Tiffany, Real Property, 3rd Ed., vol. 3, sec. 764; 67 C.J. 776.) Although an easement of pollution is not among the servitudes specified in section 801 of the Civil Code, that section does not purport to enumerate all the burdens which may be attached to land for the benefit of other property (Jersey Farm Co. v. Atlanta Realty Co., 164 Cal. 412 [129 P. 593]), and the section does recognize as appurtenant easements rights similar to the one under discussion, such as one to discharge water upon land. An appropriative right constitutes an interest in realty (Hill v. Newman, 5 Cal. 445 [63 Am. Dec. 140]; Mount Carmel Fruit Co. v. Webster, 140 Cal. 183 [73 P. 826]; South Tule etc. Ditch Co. v. King, 144 Cal. 450 [77 P. 1032]; Wiel, Water Rights, 3rd Ed., vol. 1, sec. 283; 26 Cal.Jur. 50). It can therefore appropriately serve as a servient estate to which an easement may be annexed.
 The novelty of the incident is no bar to its recognition as an easement if its creation violates no principle of public policy. There is no affirmative showing that the pollution *383 from respondent's mining operations is so extensive as to amount to a public nuisance. A valuable consideration was paid for a privilege which is neither slight nor frivolous, and the agreement between the parties clearly expresses their intention to create an easement attached to an appropriative water right binding upon assignees who acquired that right with notice, actual or constructive. The court must therefore construe it accordingly.
 [12] It remains to define the dominant tenement intended to be benefited by the grant and to which the easement became appurtenant. Although the 1883 agreement undeniably purports to create an easement appurtenant to the mining property of The Ruby Gold Gravel Mining Co., it fails to describe specifically the property or claims intended to be benefited, stating only that the grant extended to "any of its mines" or "any mine owned or operated by it." Nor do the findings of the trial court define any specific property as a dominant tenement. The court did find, however, that respondent owned the "Ruby Mine," which, as has been stated, embraces all of the claims now owned by respondent, including those acquired after the execution of the contract. And as it concluded that the respondent obtained the right forever to run tailings into Rock Creek, the effect of the judgment is to give him a right to pollute from any and all of the claims now owned and operated by him.
 Unquestionably, the easement of pollution became appurtenant to the Guatamala and Guatamala Extension, the claims owned and operated by The Ruby Gold Gravel Mining Co. at the time of the execution of the agreement. True, those claims were not described in the agreement, but the trial court properly received evidence of their ownership. [13] An intended easement will never be construed as personal when it may fairly be construed as appurtenant to some other estate. Accordingly, when the deed does not expressly declare the easement to be appurtenant, or when the language of the deed is ambiguous, and it does not clearly appear whether the easement was intended to be in gross or appurtenant to land, evidence aliunde the document is admissible to determine the nature of the easement and to establish a dominant tenement (Elliott v. McCombs, 17 Cal.2d 23 [109 PaCal.2d 329]; Hopper v. Barnes, 113 Cal. 636 [45 P. 874]; Nay v. Bernard, 40 Cal.App. 364 [180 P. 827].) This principle applies with even greater force where, as here, *384 an appurtenant easement was clearly intended, but a dominant tenement was not specifically described. As the evidence shows the ownership and operation of the two Guatamala claims by the mining company at the time of the grant, the easement of pollution must be held appurtenant thereto, and exercisable by the respondent under the rules which have been stated.
 [14] An opposite conclusion, however, must be reached as to the Garnet, Topaz, Opal, Irene and Jade claims, all of which were acquired subsequent to the execution of the agreement. In the absence of a very clear intention to the contrary, a court should not assume that the grantor contracted with reference to any claims which were not then in operation. The agreement granting to the mining company the perpetual right to pollute the stream from "any of its mines" or "from any mine owned or operated by it," must therefore be construed as referring only to those claims which were owned and operated by the company at the time the agreement was made.
 Several cases cited by respondent hold that there may be an agreement to grant an easement appurtenant to property to be acquired in the future which, as between the parties and their privies with notice, is enforceable when the dominant tenement is acquired (Wells v. North East Coal Co., 255 Ky. 63 [72 S.W. (2d) 745]; Kentucky West Virginia Gas Co. v. Crum, 258 Ky. 508 [80 S.W. (2d) 537]; Kalinowski v. Jacobowski, 52 Wash. 359 [100 P. 852]). In each of the cited cases, however, the controversy involved an agreement which expressly and unambiguously purported to grant an easement appurtenant to after-acquired property, and the court rested its decision upon the clear and unmistakable terms of the grant. In the present case, the agreement refers only to mines "operated by the company" and significantly omits the words "now or hereafter owned or operated by the company" or words of similar import. Unattached rights in property suspended in abeyance are not favored in the law. In order to validly create such rights which will benefit property to be later acquired, the parties must express their intention in such manner as to admit of no doubt.
 The Topaz, Opal, Irene and Jade claims were never owned by The Ruby Gold Gravel Mining Co. and were acquired by the respondent from third persons. It cannot be seriously contended that the agreement contemplated the creation of a *385 right to pollute the creek from mining properties acquired by a successor in interest through an independent chain of title. The evidence shows that the greater amount of debris now being deposited in Rock Creek is derived from the Garnet and the Topaz claims which were purchased by the respondent after 1933. To allow him to pollute the stream from mines operated upon these claims would permit the burden of an easement to be increased beyond the scope of the grant, contrary to the established principles of property law (Winslow v. City of Vallejo, 148 Cal. 723 [84 P. 191, 113 Am.St.Rep. 349, 7 Ann. Cas. 851, 5 L.R.A. (NS) 851]; Gurnsey v. Northern California Power Co., 160 Cal. 699 [117 P. 906, 36 L.R.A. (N.S.) 185]; Civ. Code, sec. 806; 9 Cal.Jur. 950, 951.)
 [15] The respondent contends that the appellant has not shown any irreparable injury and has thus failed to make out a case for injunctive relief. According to him, the absence of irreparable injury is clearly demonstrated by the fact that the appellant has an adequate supply of water from an independent source, and by the additional fact that one Costa, appellant's predecessor in title, conveyed to the Wisconsin-North Fork Gravel Mines, another mining company conducting mining operations on Rock Creek above the Kennedy Ranch, the right to pollute the creek under a recorded agreement similar to the one now under consideration.
 The finding that the appellant has a supply of water from Woodruff Creek sufficient for her needs is directly contrary to the evidence, for the agreement under which she acquired the right to waters from that creek expressly limits her use of it to domestic and culinary purposes. She acquired no right thereunder to divert water for the purposes of irrigation. In any event, it is no defense to the respondent's tortious act that the appellant enjoys a supply of pure and wholesome water from another source (Durham v. Eno Cotton Mills, 141 N. C. 615 [54 S.E. 453, 7 L.R.A. (N.S.) 321]). The existence of the additional water right may only be urged in mitigation of damages and not as a complete bar to an action for injunction and damages.
 [16] Nor is the Costa agreement a bar to injunctive relief against the respondent. Although that agreement may be binding upon the appellant, the evidence fails to show any pollution of Rock Creek from the workings of the Wisconsin Company. On the other hand, the evidence does show that the respondent has discharged tremendous quantities of tailings into the *386 stream. Until it appears that the pollution caused by the Wisconsin mine is of such enormity as to render the waters of the stream wholly unfit for any purpose, apart from the pollution resulting from any other source, it may not be said that appellant is not irreparably injured by the respondent's operations.
 [17] But the respondent asserts a right to pollute the creek from the entire Ruby Mine, relying upon the equitable doctrine of the "balancing of the conveniences." Under this doctrine, a court of equity may deny injunctive relief and relegate the plaintiff to his remedy at law, if the benefit resulting to him from the granting of the injunction will be slight as compared to the injury caused the defendant thereby (Frost v. City of Los Angeles, 181 Cal. 22 [183 P. 342, 6 A.L.R. 468]; Peterson v. Santa Rosa, 119 Cal. 387 [51 P. 557]; Clough v. W. H. Healy Co., 53 Cal.App. 397 [200 P. 378]). Despite a proper showing in other respects of a right to injunctive aid, if a plaintiff is merely seeking to protect a technical and unsubstantial right, and the issuance of the injunction will bring no actual advantage, it may be properly refused where to do otherwise would result in unusual hardship to the defendant or the public.
 [18] The respondent, however, has not proved facts sufficient to provide a basis for the application of that principle. In his briefs, he alleges that the Kennedy Ranch is of "doubtful value"; that plaintiff enjoys a right to unpolluted water from an independent source; and that the granting of an injunction would be an ineffective and useless act, as the appellant would receive no protection therefrom because of the right enjoyed by the Wisconsin Mine to pollute the stream to any extent at any time. On the other hand, he asserts that he will be greatly damaged by the issuance of the writ. He alleges that tailings from the Ruby Mine cannot be impounded or disposed of anywhere except in Rock Creek. To grant the injunction, he contends, will force the closing of a mine "valued at many hundreds of thousands of dollars," throw "thirty to fifty" persons employed by him out of work, and seriously injure the inhabitants of Sierra County.
 None of these assertions is supported by the evidence. The appellant's property is not of doubtful value, for the evidence affirmatively shows that at least three-fourths of the Kennedy Ranch is productive and particularly suitable for the raising of fruits and grain. And as the appellant does not enjoy an *387 adequate supply of water from Woodruff Creek for irrigation purposes and because the evidence fails to show any pollution of Rock Creek by the Wisconsin Mine, there is no foundation for the claim that the appellant will not gain any protection by an injunction.
 Turning to the respondent's allegations of irremedial injury, there is no proof to support his assertion that Rock Creek is the only source of disposal of debris from the Ruby Mine. Furthermore, there is no evidence whatsoever in the record as to the value of the respondent's properties or operations. The record is also silent as to the number of persons employed by him at the mine. And there is no showing that the inhabitants of Sierra County have any vital interest in the continuance of his mining operations. The appellant seeks to protect a substantial right by injunction, and the remedy should not be denied her upon claims of unusual hardship to the respondent, wholly unsupported by proof. Moreover, the courts of this state have manifested a reluctance to apply the doctrine of balancing the conveniences to a situation where, as here, the act complained of is in its incidents wilfully tortious (Hulbert v. California etc. Cement Co., 161 Cal. 239 [118 P. 928, 38 L.R.A. (N.S.) 436]; 14 Cal.Jur. 232), excepting cases where an injunction to restrain a nuisance will produce some great public mischief (Frost v. City of Los Angeles, supra).
 [19] Finally, the doctrine relied upon by the respondent presupposes a right in the appellant to an injunction but for the balance of convenience against her demand for it. The court's determination that the appellant's rights are barred by the 1883 agreement left no basis for the consideration of that principle, although it is mentioned in the order denying a new trial.
 The judgment is reversed.
 Gibson, C.J., Curtis, J., Houser, J., Carter, J., and Traynor, J., concurred.