[Civ. No. 387.   Fifth Dist.   Jan. 26, 1965.]

A. LEGGIO, Plaintiff and Respondent, v. JOHN F. HAG-GERTY et al., Defendants and Appellants.

T. H. Werdel and Arthur E. Wallace for Defendants and Appellants.

Deadrich, Bates & Lund and Kenneth H. Bates for Plaintiff and Respondent.

BROWN (R. M.), J.—This action, brought by the plaintiff, seeks a declaration of the rights of the parties in certain spring water located in a portion of what is described as Section 2, Township 27 South, Range 33 East, M. D. B. & M., in the Lake Isabella area in the County of Kern (the servient tenement). ██ ██ In 1898 the owners of the property in Section 2, Brady, Brady and Mulligan, granted to Walker Rankin all of the water flowing from the springs in said Section 2, together with certain rights to maintain dams, wiers and aqueducts necessary for the proper development of the water, together with a permanent right of way for a pipeline through this property and to conduct the same from Section 2 to the land of Walker Rankin in the adjoining Township north, to be used on what is known as the "Roland Ranch," subject to the grantors' reserving enough of said water to supply the same for not more than 150 head of cattle, and to place a certain number of troughs thereon to properly water said cattle.

In 1913 Walker Rankin conveyed to Charles, Edward and Walker Rankin, Jr. a 1,000-acre parcel which is in Township 26, to the north of said Section 2, said 1,000 acres being portions of Sections 14, 15, 22 and 23 in the area of Lake Isabella. This deed contains specific references to the water interests created by the Brady-Mulligan deed and to the water pipeline, and specifies that the line runs from the servient estate to and upon the 1,000-acre parcel, and mention is also made of the "Roland Ditch."

In 1917 Edward and Walker Rankin, Jr. conveyed to Charles Rankin their interests in the said 1,000-acre parcel, mentioning the same references to the water rights and ditches as set forth in the Brady-Mulligan deed.

In 1919 Charles Rankin conveyed the same parcel, containing the same references to the water rights and ditches, to Leroy Rankin.

In 1921 Leroy Rankin deeded several parcels, including the same 1,000 acres, to J. J. Doyle, making specific references

to the water rights, pipeline and ditches, and also mentioning that the named ditches are used to convey water to what is known as the "Lower Rankin Ranch."

Thereafter, between 1921 and 1946, the 1,000 acres, alleged to be the dominant tenement, passed from Doyle to Wood; from Wood back to Doyle; from Doyle to Cecelia Doyle; from Cecelia Doyle to Rudnick and Blackley, no mention being made in any of the above conveyances of the water and pipeline rights. In 1946 Rudnick and Blackley quitclaimed to Gautschi and Timm their rights "in and to the water rights appurtenant to" the 1,000-acre parcel; and finally, Gautschi and Timm deeded the 1,000 acres to the JXJ Ranch. There was no mention in this latter instrument of the Brady-Mulligan deed or the water or pipeline rights set forth therein.

In June 1952 the JXJ Ranch, then owner of the 1,000-acre parcel, executed a deed to the State of California conveying 5.967 acres, with no mention of the Brady-Mulligan deed or the water or pipeline rights, and in August 1952, the United States of America filed a decree on declaration of taking which, among other parcels, included the 1,000-acre parcel except for a small portion, making their taking only 987.13 acres of that parcel. This property is now covered by Lake Isabella.

On May 26, 1961, the remaining portion of the 1,000 acres not taken by the United States government or deeded to the State of California, being approximately 7.9 acres, was transferred by the JXJ Ranch to the appellants by quitclaim deed, also releasing all of its right, title and interest in and to the water pipeline and rights running with said pipeline as described in the Brady-Mulligan deed.

On February 2, 1961, after the State of California acquired title to the 5.967 acres, it quitclaimed to Rudnick all of its right, title and interest in and to the water rights mentioned in the Brady-Mulligan deed.

A similar quitclaim deed was made by the United States of America to Rudnick on August 25, 1960, releasing all water rights described in the Brady-Mulligan deed.

On March 17, 1961, a similar quitclaim deed was made by Rudnick to the respondent, with reference to the Brady-Mulligan deed, and also releasing all rights acquired under the U.S.A. and State of California quitclaim deeds.

It will be noted that at this time the respondent owned no other property involved in this matter; however, Rudnick had acquired the servient estate on November 13, 1957, and on September 29, 1961, Rudnick deeded the servient estate to the

respondent. This chain of title is established by various deeds introduced as exhibits.

In addition to the 1961 quitclaim deed of JXJ Ranch to the appellants of the remaining 7.9 acres of the 1,000 acres and the water rights described in the Brady-Mulligan deed, the appellants claimed ownership through various other deeds from the Doyle interests, with no mention of the Brady-Mulligan water rights, except for the quitclaim deed from Rudnick and Blackley to Gautschi and Timm, which released all rights ''in and to the water rights appurtenant to'' the 1,000-acre parcel.

In May 1961, the Gautschi interests made various quitclaim deeds to the appellants, and Timm made a similar quitclaim, all quitclaiming their interests in the Brady-Mulligan deed water pipeline rights; and on August 15, 1961, the estate of Cecelia Doyle Boyd made a quitclaim deed to the appellants of its interest in and to the water rights, ditches (including the ''Roland Ditch'') and water pipeline to the ''Lower Rankin Ranch'' as set forth in the Brady-Mulligan deed.

The testimony presented to the court established the fact that a pipeline had been installed from the springs in Section 2, the servient tenement, and that water was conducted through this pipeline to the 1,000-acre parcel in the township to the north, which the court found to be the dominant tenement, approximately 3 miles from the servient tenement; that less than one-fifth of the total water of the springs went through the pipeline and that four-fifths was used, or lost, within the servient tenement.

After the trial, the court filed findings of fact and conclusions of law that the deed created an easement appurtenant and that the same was attached to the 1,000-acre parcel identified as the ''Roland Ranch''; that the burden of the easement owned by the respondent had been released and discharged as to 992.877 acres of the 1,000-acre parcel, which thus released and discharged the servient tenement accordingly; that the respondent was entitled to the use and benefit of 93.097 per cent of the spring waters arising upon the servient tenement; and that the appellants are the owners of the remaining 6.903 acres of the dominant tenement and entitled to 6.903 per cent of the water flowing from the springs in the servient estate in Section 2, as well as the right to maintain the pipeline.* Judgment was entered accordingly.

---

*The percentages are incorrect, but the error benefits appellants. The respondent has not appealed from the judgment. (*Moss* v. *Crandell,* 197 Cal.App.2d 220, 223 [16 Cal.Rptr. 912].)

The controversy, as contended by the appellants, is that the Brady-Mulligan deed to Rankin in 1898 was a conveyance of "private waters" or a conveyance of a *profit à prendre,* or an easement in gross; that the United States of America and the State of California acquired no interest in such spring waters and therefore their quitclaim deeds conveyed nothing to the respondent through his chain of title; and that the appellants, by their chain of title, are now the owners of all the rights created by the Brady-Mulligan deed; or, that if said easement is to be considered as an easement appurtenant, that it has been extinguished in effect by the United States of America and the State of California to the extent that the appellants have succeeded to 100 per cent, or all, of the waters from the Brady-Mulligan springs and that the alleged dominant tenement is now owned by the appellants as the owners of the only portion that can make any use of the servitude which is appurtenant to it.

### Was the Easement an Easement in Gross or an Easement Appurtenant?

Originally, under the common law, easements in gross were personal and not transferable, as set forth in *Eastman* v. *Piper,* 68 Cal.App. 554, 567 [229 P. 1002]. ██ However, in *Collier* v. *Oelke,* 202 Cal.App.2d 843, 846-847 [21 Cal.Rptr. 140], this dictum was disapproved, and an easement in gross is property and can be transferred.

██ The deeds from September 7, 1898, to January 20, 1921, inclusive, mention the easement, and we think that the court was correct in finding that such was an easement appurtenant.

██ "An intended easement will never be construed as personal when it may fairly be construed as appurtenant to some other estate. Accordingly, when the deed does not expressly declare the easement to be appurtenant, or when the language of the deed is ambiguous, and it does not clearly appear whether the easement was intended to be in gross or appurtenant to land, evidence *aliunde* the document is admissible to determine the nature of the easement and to establish a dominant tenement. [Citations.] The principle applies with even greater force where, as here, an appurtenant easement was clearly intended, but a dominant tenement was not specifically described." (*Wright* v. *Best,* 19 Cal.2d 368, 383-384 [121 P.2d 702].)

(See also *Elliott* v. *McCombs,* 17 Cal.2d 23, at page 29 [109 P.2d 329].)

Though the *Eastman* v. *Piper* case, *supra,* was supplanted by *Collier* v. *Oelke, supra,* as to the assignment of easements in gross, the following is a correct statement: ". . . an easement is never presumed to attach to the person of the grantee when it can fairly be construed to be appurtenant to some other estate. Whenever the right in question is in its nature an appropriate and useful adjunct of the land owned by the grantee of the easement, having in view his intention as to its use, and there is nothing to show that the parties intended it to be a mere personal right, it will be held to be an easement appurtenant and not in gross." (*Eastman* v. *Piper,* 68 Cal.App. 554, at page 568 [229 P. 1002].)

It was said in *Jones* v. *Deardorff,* 4 Cal.App. 18, 24 [87 P. 213] : "The grant in this case created an easement and the evidence shows that it became appurtenant to defendants' land as the court found. Whether an easement in a given case is appurtenant or in gross is determined mainly by the nature of the right and of the intention of the parties creating it; but the courts favor the construction of grants of these rights as appurtenant rather than in gross, and if the right in question is in its nature an appropriate and useful adjunct of the land conveyed, having in view the intention of the grantee as to its use, and there being nothing to show that the parties intended it to be a mere personal right, it would be held to be an easement appurtenant to the land, and not an easement in gross."

And in volume 28 of Corpus Juris Secundum, Easements, section 4, page 633, at page 638, it is stated: ". . . an easement in gross is not favored, and an easement will never be presumed to be a mere personal right when it can fairly be construed to be appurtenant to some other estate."

The "Special Note" in the Restatement of the Law of Property, section 450, pages 2901-2902, dealing with the definition of servitudes, states: "Interests of the sort here discussed under the title 'Easements' have traditionally been discussed under the separate titles of 'Easements' and 'Profits.' In phrasing the rules applicable to each of these interests it has been found, however, that in no case was there a rule applicable to one of these interests which was not also applicable to the other. This is not true with respect to English law. Under that law the interest designated as an easement can exist only as an appurtenance of a dominant tenement, while a profit may exist independently of such a tenement, or, as it is commonly expressed, in gross. From this essential

difference largely came the differentiating designations which we have inherited. This difference does not exist in this country. Here we have 'easements in gross' as well as 'profits in gross.' Since we have both 'easements in gross' and 'profits in gross' and since the rules with respect to both 'easements' and 'profits' can be stated in identical terms, it is much more convenient to use a single term to designate both interests rather than to use to the extent of annoying repetition the cumbrous phrase 'easements and profits.' Accordingly this has been done and the term selected as that most nearly in accord with accustomed usage is the term 'easements.' "

Also, in Restatement of the Law of Property, section 453, at page 2914, it is said: "An easement is appurtenant to land when the easement is created to benefit and does benefit the possessor of the land in his use of the land."

▆▆▆ The Brady-Mulligan deed was mentioned throughout all the conveyances until 1921, and we think sufficiently identified the dominant tenement for that date in J. J. Doyle. The question has been raised by the appellants that there was no satisfactory description of the dominant estate and therefore the easement would have had to be in gross. *Wright* v. *Best, supra,* 19 Cal.2d 368, 383-384, as previously quoted above, states: ". . . evidence *aliunde* the document is admissible to determine the nature of the easement and to establish a dominant tenement," and applies with even greater force where, ". . . an appurtenant easement was clearly intended, but a dominant tenement was not specifically described."

And in *Westlake* v. *Silva,* 49 Cal.App.2d 476, 478 [121 P.2d 872], the court stated: "A quitclaim deed transfers whatever present right or interest the grantor has in the property. [Citation.] An easement is an incorporeal hereditament in the servient estate. [Citations.] An easement appurtenant to land cannot be severed from the land and transferred separately so as to convert it into an easement in gross but it may be extinguished by a surrender or release to the owner of the servient estate."

It is stated in *Nay* v. *Bernard,* 40 Cal.App. 364, 368 [180 P. 827]: "The principle established by *Hopper* v. *Barnes, supra* [113 Cal. 636 (45 P. 814)], has been applied in a number of later cases, in all of which an easement conveyed by an express grant was held to have been appurtenant to a dominant tenement by reason of facts appearing *aliunde* the deed, and notwithstanding that no description of such dominant tenement was contained in the grant." (See also *Owsley* v.

*Hamner*, 36 Cal.2d 710, 718-719 [227 P.2d 263, 24 A.L.R.2d 112].)

We thus conclude that the trial court was correct in finding that the dominant estate was the 1,000-acre tract which now includes the property owned by the United States of America, the State of California, and the appellants.

### Apportionment

█ Holding that the easement is appurtenant to the estate, the United States and the State of California becoming the owners of 993.097 acres operated to partition the easement itself. In volume 3, Powell on Real Property, paragraph 418, at page 475, it is said: ''Easements appurtenant are readily apportionable upon a subdivison of the original dominant tenement. This means that each part of the dominant tenement is entitled to claim the benefit of the easement for the service of his special segment.''

The general rule of apportionment is set forth in Civil Code section 807, as follows: ''In case of partition of the dominant tenement the burden must be apportioned according to the division of the dominant tenement, but not in such a way as to increase the burden upon the servient tenement.''

█ The quitclaim deeds of the United States and the State of California to Rudnick did extinguish the easement only as far as their share of the benefits would be in favor of Rudnick, as the owner of the servient tenement, and are so estopped forever to reestablish such portion of the easement.

█ The quitclaim deed from Rudnick to Leggio, the respondent, at the time it was made on March 17, 1961, was of no effect because it attempted to convert the easement appurtenant into an easement in gross. (See *Westlake* v. *Silva, supra,* 49 Cal.App.2d 476; 2 Witkin, Summary of Cal. Law, § 196, pp. 1032-1033.) But inasmuch as it later became effective by the after-acquired title of respondent from Rudnick on September 29, 1961, when the servient estate was deeded by him in fee, it was effective only to the extent of being a release and extinguishment. But such cannot release any interests which appellants had in the water as owners of the remaining part of the dominant tenement.

█ To extinguish an easement as far as all the dominant tenement is concerned, a complete merger is required, as set forth in volume 17, California Jurisprudence 2d, section 41, pages 150-151, as follows: ''A servitude is extinguished by the vesting of the right to a servitude and the right to the servient

tenement in the same person, for the owner of the servient tenement cannot hold a servitude thereon. However, a servitude, or easement, so merged with the servient tenement remains extinguished only for the time that the unity of title continues.

"In order to come within the rules just stated, the ownership of the dominant and servient estates must be coextensive and equal in validity, quality, and all other characteristics. The fact that the owner of one of several lots, each of which abuts on an alleyway easement, becomes the owner of the fee in the alley does not extinguish the easement by merger so as to destroy the easement previously created in favor of the other lots.

"An appurtenant easement may be extinguished by its surrender or release by the dominant owner to the owner of the servient estate, but a quitclaim deed to the owner of the servient estate does not terminate an easement reserved in a deed by the same grantor in favor of an adjoining parcel. And the act of the owner of a dominant estate, who holds a mortgagee's interest in the servient tenement as the beneficiary of a deed of trust, in executing a quitclaim deed and release for the purpose of carrying into effect the provisions of the trustee's deed to the servient estate, does not extinguish an easement across the servient estate."

In *Crease* v. *Jarrell*, 65 Cal.App. 554, 560 [224 P. 762], it was said: "Had the lumber company acquired title to all the property, enjoying an abutting owner's rights in the use of the alley, together with the way itself, a merger could not successfully have been denied; but the ownership of title to a single lot and to the ground upon which a right of way exists cannot be said to destroy the easement created in favor of all other adjoining lots of respondents which were originally laid out and sold with this benefit attached as a part, at least, of the consideration."

And in *Cheda* v. *Bodkin*, 173 Cal. 7, 16-17 [158 P. 1025], the court said: "That there was in reality no merger of the tenements constituting the easement when Mrs. Frances O. Pacheco-Laydon owned both ranches was correctly decided by the lower court. She held her water rights in the Molinari tract in common with others. There was, therefore, no merger because, in order that such a result may ensue, there must be a unity of estates in all respects. [Citation.] In order that unity of title to two estates should extinguish an existing easement the ownership of the two estates should be coex-

tensive, equal in validity, quality, and all other characteristics.''

The matter is further discussed in volume 28, Corpus Juris Secundum, Easements, section 57, pages 720-721:

''a. In General

''When an estate in fee and an easement in the estate are acquired by the same person, the easement is extinguished by merger or confusion.

''When an estate in fee and an easement in the estate are acquired by the same person, the easement is extinguished, for the reason that the owner having the jus disponendi— the full and unlimited right and power to make any and every possible use of the land—all subordinate and inferior derivative rights are necessarily merged and lost in his higher right. So long as a tract remains in one ownership, there can be no dominant and servient tenements as between different portions, and the owner may rearrange the quality of any possible servitude. Accordingly, an easement is extinguished when ownership of the dominant and servient estates becomes united in one person, as when the owner of the dominant estate acquires title to the servient estate, or the owner of a servient estate acquires title to the dominant estate. In such cases, the easement is said, by the common law, to be extinguished, and, by the civil law, to be lost in confusion. A uniting of the ownership of estates merely adjoining a servient estate does not, of course, extinguish an easement appurtenant to one of such estates.

''b. Limitations and Exceptions to Rule

''In order to extinguish an easement by merger, there must be unity of title and, according to some decisions, of possession and enjoyment of the dominant and servient estates, coextensive in validity, quality, and all other circumstances of right. Ways of necessity and natural easements are, strictly speaking, not subject to the doctrine of merger.

''In order that an easement will be extinguished under the doctrine of merger, there must be unity of title and, according to some decisions, of possession and enjoyment of the dominant and servient estates. Unity of title denotes, within the meaning of this requirement, unity of valid title, title in the name of the same person, and, of course, simultaneous ownership. In several decisions, it has been held or said that the owner should have a permanent and enduring estate, an estate in fee, in both the dominant and servient estate, not

liable to be disjoined again by operation of law. In any event, mere unity of possession is not enough. Further, the ownership of the two estates should be coextensive and equal in validity, quality, and all other circumstances of right. Accordingly, an easement is not extinguished under the doctrine of merger by the acquisition by the owner of the dominant or servient estate of title to only a fractional part of the other estate.''

Section 61, volume 28 of Corpus Juris Secundum, page 727, at page 728, states: ''Thus, a release by the owner of only part of the dominant estate or estates will not effect a release of the rights of owners or other parts of such estate or estates; . . .''

In volume 3, Tiffany on Real Property (3d ed.), section 824, page 384, the matter is also discussed, and it reads: ''One who has only a partial or limited interest in the dominant tenement can obviously extinguish the easement by release only as against himself.''

Thus, the federal government could release its rights to the dominant tenement but in no way could that affect the rights of the remaining dominant tenement owners. It is therefore obvious that the remaining dominant tenement owner did get its share of the benefits conferred by the easement appurtenant. The owners of the dominant tenement who quitclaimed their rights to the easement (the United States of America and the State of California) cannot in any way lessen such benefits as far as the remaining approximately 7.9 acres of the dominant tenement are concerned even though such rights may in effect be released to the servient owner. For example, if the pipeline was across the portion of the dominant estate released to the servient owner, this would not permit the servient owner to remove, or affect the use of, the pipeline. However, pursuant to section 807 of the Civil Code, the burden must be apportioned according to the division of the dominant tenement, but this does not mean, nor does it follow, that the remaining dominant tenement gets 100 per cent of the burden carried by the servient tenement. Therefore, there was no error in the apportionment made by the trial court.

*Was Appellants' Demurrer Properly Overruled?*

The appellants have asserted that their demurrer should have been sustained in that the complaint failed to state a cause of action.

The action sought a declaration of rights concerning

springs in the servient tenement in Section 2, and alleged that a controversy between appellants and respondent had arisen in connection with the Brady-Mulligan deed.

We think that the complaint was sufficient to state a cause of action concerning the actual controversy which exists. We quote from *Zeitlin* v. *Arnebergh*, 59 Cal.2d 901, at pages 907-908 [31 Cal.Rptr. 800, 383 P.2d 152], as follows: "Since plaintiffs set forth facts showing the existence of an actual controversy and have requested that these rights be adjudged by the court in a matter in which the court is competent to grant declaratory relief, they have stated a legally sufficient complaint. Upon presentation of such complaint, a plaintiff is entitled to a declaration of his rights, whether the declaration be favorable or adverse; thus in the instant case the trial court's order sustaining the demurrer and its dismissal of the action cannot be upheld upon the ground that plaintiffs pursued the wrong kind of action."

An examination of the evidence indicates that all the evidence was consistent with the issues as made by the pretrial order.

The judgment is affirmed.

Conley, P. J., and Stone, J., concurred.

A petition for a rehearing was denied February 24, 1965, and appellants' petition for a hearing by the Supreme Court was denied March 24, 1965.