[No. A117111. First Dist., Div. One. Sept. 2, 2008.]

GAETANO ZANELLI, Plaintiff, Cross-defendant and Appellant, v. THOMAS MCGRATH, Defendant, Cross-complainant and Respondent.

**COUNSEL**

Zacks Utrecht & Leadbetter, Andrew M. Zacks and James B. Kraus for Plaintiff, Cross-defendant and Appellant.

Wiegel & Fried, Andrew J. Wiegel and John P. Baba for Defendant, Cross-complainant and Respondent.

OPINION

**MARCHIANO, P. J.**—Gaetano Zanelli (Zanelli), the owner of property commonly known as 66 Clarendon Avenue, appeals from a judgment quieting title to an adjacent property owned by Thomas McGrath (McGrath) commonly known as 60 Clarendon Avenue. After a court trial, the court found that Zanelli has no enforceable view easement burdening McGrath's property, either because the easement was extinguished by merger, or was released to McGrath when Richard Sommer (Sommer), Zanelli's predecessor in interest, who then owned both 66 and 60 Clarendon, conveyed to McGrath all his interest in 60 Clarendon without reserving the easement.

■ We affirm the judgment on the ground that the easement was extinguished by merger, and therefore will not reach the merits of the court's alternative holding that the easement was conveyed to McGrath when Sommer failed to reserve it in the deed.

FACTS

In April of 2002, McGrath entered into a vacant land purchase agreement to purchase 60 Clarendon Avenue from Sommer and Jeffrey Dunham (Dunham). McGrath is a contractor, and he intends to build a residence on the property. For several years, Sommer and Dunham also owned the adjacent property at 66 Clarendon, but in July of 1998, Dunham deeded his interest in 66 Clarendon to Sommer. At the time of the sale of 60 Clarendon to McGrath, Sommer also owned 66 Clarendon. A dispute arose between Sommer and McGrath as to whether a view easement benefiting 66 Clarendon and burdening 60 Clarendon had been extinguished by merger, and escrow ultimately closed without resolution of the dispute.

In September 2003, Sommer sold 66 Clarendon to Zanelli with full disclosure of the dispute. Zanelli's agent advised him that the view easement could be invalid "due to merger." Sommer discounted the price of the property in recognition of the risk Zanelli undertook, and Zanelli knew that it would be his burden to enforce the easement.

Zanelli filed his complaint for declaratory and injunctive relief on June 14, 2005, and McGrath filed a cross-complaint to quiet title in August 2005. The trial court entered a stipulated preliminary injunction prohibiting McGrath from building a structure that would violate the disputed view easement until a final decision was rendered. The parties stipulated to a private reference

before Judge David Garcia. After a trial, Judge Garcia rendered a statement of decision in McGrath's favor.[1] The court found as follows:

In 1981, Ted J. Horsely and Dennis L. Sunderhaus owned 60 and 66 Clarendon. They conveyed the 66 Clarendon parcel to Mr. and Mrs. Soffer. At the same time, they granted the Soffers an easement "for receiving light, air, and view" over the 60 Clarendon parcel, described as follows:

"GRANTOR WILL LIMIT any construction on said Lot 44 for the roofline to be at an approximate angle of 30 [degrees] not to exceed 5 feet in height above the deck railing. Roof extending to crossing at a point not more tha[n] 8 feet northward on the same railing at 66 Clarendon Avenue and continuing to slope beneath deck.

"The foregoing covenants shall run with the land and be binding upon the Grantor, his successors and assigns and said covenant shall inure to the benefit and be enforceable by Grantee, his successors and assigns in ownership."[2]

Sommer and Dunham purchased 66 Clarendon as joint tenants on February 14, 1992. The deed referenced the 1981 view easement benefiting 66 Clarendon. In 1994 Sommer and Dunham purchased 60 Clarendon from Horsely. They each purchased an undivided 50 percent interest, as tenants in common, but Dunham held his interest as trustee for the Jeffrey S. Dunham Revocable Trust. This deed did not refer to a view easement burdening 60 Clarendon.

Sommer and Dunham owned both 66 Clarendon and 60 Clarendon until June 30, 1998, when Dunham transferred his interest in 66 Clarendon to Sommer by grant deed. This deed referenced an easement "for receiving light, air, and view" burdening 60 Clarendon, and benefiting 66 Clarendon, but did not include the specific description and limitations of the 1981 view easement.[3]

Sommer and Dunham decided to sell 60 Clarendon in 2002. Although Sommer testified that he and Dunham considered the effect of a view easement benefiting 66 Clarendon and burdening 60 Clarendon in pricing the

---

[1] We hereafter refer to the referee as the "court" because, pursuant to Code of Civil Procedure section 638, the referee's statement of decision and subsequent judgment are filed and entered as if they were the statement of decision and judgment of a sitting judge.

[2] We shall hereafter refer to this as the "1981 view easement."

[3] In his reply brief Zanelli clarifies that he "does not seek to affirm [this] easement between Sommer and Dunham, but the one recorded [in 1981] by their predecessors."

property,[4] they marketed 60 Clarendon as a buildable site with panoramic views, and the multiple listing did not mention the existence of a " 'view' easement."

McGrath made a bid, and entered into an agreement to purchase 60 Clarendon on April 4, 2002. Although there was conflicting evidence on the issue, the court found that "it was not until after [McGrath] made his offer to purchase the property that there was any mention of the [1981 view] easement" benefiting 66 Clarendon. Sommer and Dunham's real estate agent, Janet Schindler, transmitted to McGrath a preliminary title report with exceptions in paragraphs 4 and 6, referencing two view easements affecting the property.[5] When he first learned of the 1981 view easement benefiting 66 Clarendon during the contingency removal period, McGrath turned the matter over to his legal advisor, Brett Gladstone. After discussing the pros and cons of removing the contingencies under the contract, McGrath decided to remove the contingencies, understanding that by doing so he gave up the right to cancel the contract based upon information contained in the preliminary title report.

After a year of negotiations, McGrath was unable to resolve the dispute with Sommer and Dunham. McGrath, through his lawyer, insisted that the sellers could not evade closing escrow based upon this dispute without breaching the contract. McGrath also understood that if he closed escrow he was buying 60 Clarendon potentially burdened by the 1981 view easement. Ultimately, the deed from Sommer and Dunham to McGrath did not contain any reference to the 1981 view easement or expressly reserve an easement, and the 1981 view easement was excluded from insurance coverage.

Based upon the foregoing, the trial court framed the issue as whether "as a matter of law [Sommer and Dunham's] common ownership [of 60 and 66 Clarendon was] of the type necessary to effect the merger of the parcels for purposes of extinguishment of the 'view' easement." It concluded that the 1981 view easement was extinguished by merger when Sommer and Dunham owned both 66 Clarendon and 60 Clarendon. On the issue whether Sommer and Dunham intended the easement to be extinguished, the court stated it

---

[4] Conflicting evidence was presented on the question whether the price McGrath paid was discounted to reflect the burden of the 1981 view easement. An expert called by Zanelli testified that the value of 60 Clarendon, unburdened by *any* view restriction, would have been $800,000 to $875,000, instead of the $595,000 McGrath paid. There was, however, one other view easement with a different description benefiting 56 Clarendon that McGrath did not challenge. McGrath's real estate agent testified that since the custom was to include restrictions in listings, he assumed 60 Clarendon was an unrestricted lot and his opinion at the time of the listing was that the price was appropriate.

[5] The reference at paragraph 4 of the title report was to the easement benefiting 56 Clarendon, which is not at issue in this case.

would not credit Sommer's testimony because it was self-interested in light of the dispute. Instead the court inferred an intent to extinguish the easement from the fact that Sommer and Dunham did not develop 60 Clarendon, a fact the court found more consistent with intent to extinguish. The court reasoned that leaving the property undeveloped preserved their unrestricted view, yet provided them with the option of later selling to a developer interested in the highest and best use without the restriction of the easement. The court also denied Zanelli's request that the easement nonetheless be enforced on equitable grounds, because it found that the equities "favor McGrath."

As an alternative ground for entering judgment in McGrath's favor, the court ruled that even if the 1981 view easement had not been extinguished by merger, Sommer's grant deed to McGrath "conveyed all of the interests which he held in 60 Clarendon, including any interest in a claimed easement," because Sommer also owned 66 Clarendon and made an unqualified grant of all his interest in 60 Clarendon without expressly reserving the easement benefiting 66 Clarendon in the grant deed to McGrath.

ANALYSIS

### Extinguishment by Merger

An appurtenant easement is "a nonpossessory ' "interest in the land of another that gives its owner the right to use the land of another or to prevent the property owner from using his land." ' " (*Kazi v. State Farm Fire & Casualty Co.* (2001) 24 Cal.4th 871, 880 [103 Cal.Rptr.2d 1, 15 P.3d 223].) Civil Code section 811[6] provides that a servitude is extinguished "[b]y the vesting of the right to the servitude and the right to the servient tenement in the same person."[7] Section 805 provides: "A servitude thereon cannot be held by the owner of the servient tenement." "Section 497 of the Restatement of Property states the rule as follows: 'An easement appurtenant is extinguished by unity of ownership of estates in the dominant and servient tenements to the extent to which the uses which could have been made prior to the unity by virtue of ownership of the estate in the dominant tenement can be made after the unity by virtue [of] ownership of the estate in the servient tenement.' " (*Renden v. Geneva Development Corp.* (1967) 253 Cal.App.2d 578, 587, fn. 7 [61 Cal.Rptr. 463] (*Renden*).) The rationale underlying sections 805 and 811 is "to avoid nonsensical easements—where they are without doubt unnecessary because the owner owns the estate." (*Beyer v. Tahoe Sands Resort* (2005) 129 Cal.App.4th 1458, 1475 [29 Cal.Rptr.3d 561] (*Beyer*).)

---

[6] All subsequent statutory references are to the Civil Code unless otherwise indicated.

[7] Section 803 specifies that "[t]he land to which an easement is attached is called the dominant tenement; the land upon which a burden or servitude is laid is called the servient tenement."

The facts relevant to the question whether the 1981 view easement was extinguished when Sommer and Dunham acquired title to 60 Clarendon in 1994 are not disputed: Sommer and Dunham acquired title to 66 Clarendon as joint tenants on February 14, 1992. In 1994 Sommer and Dunham acquired title to 60 Clarendon as tenants in common. Each held an undivided 50 percent interest, but Dunham held his interest as trustee for the Jeffrey S. Dunham Revocable Trust. Sommer and Dunham owned both 66 Clarendon and 60 Clarendon until June 30, 1998, when Dunham transferred his interest in 66 Clarendon to Sommer by grant deed.

### ISSUES

The primary questions for our review are issues of law: (1) Does the doctrine of merger codified in sections 805 and 811 apply when "the right to the servitude," i.e., the 1981 view easement appurtenant to 66 Clarendon, and "the right to the servient tenement," i.e., 60 Clarendon, are not vested in a single individual, but in the same persons; (2) Does the right of survivorship with respect to the joint tenancy in 66 Clarendon, and the fact that Dunham held his interest in 60 Clarendon as trustee for his inter vivos revocable trust, render the estates Sommer and Dunham held in the dominant and servient tenements unequal, thereby precluding extinguishment by merger; and (3) If extinguished, was the 1981 view easement revived upon severance of the formerly dominant and servient parcels?

Zanelli also challenges the sufficiency of the evidence to support the court's findings on the issue of intent, and the court's conclusion that the equities weighed in favor of McGrath in response to Zanelli's request not to find merger, or to enforce the 1981 view easement on equitable grounds.

1. *Effect of Ownership of Right to Servitude and Right to the Servient Tenement by More Than One Person.*

Zanelli first contends that the common ownership of 60 and 66 Clarendon did not extinguish the 1981 view easement, because extinguishment by merger occurs only when the right to the servitude and the right to the servient tenement vest "in the same person" (§ 811), meaning in *one* person, whereas, here, the rights to the servitude and to the servient tenement were co-owned by the same *two* people, Sommer and Dunham. He bases this argument upon the use of the singular "person," in section 811, and upon general statements of the principle of extinguishment by merger in case law that also use the singular "person."

■ As a matter of statutory interpretation, Zanelli's argument fails for the simple reason that section 14 provides that words in the Civil Code in the

singular include the plural. Therefore nothing in the plain language of section 811 precludes finding that the easement was extinguished because the right to the servitude and the servient tenement vested in the same persons. We also note that the Restatement expressly includes "a group of persons" in its statement of the principle and rationale for extinguishment by merger: The rationale for this doctrine is that "[w]hen the burdens and benefits are united in a single person, *or group of persons*, the servitude ceases to serve any function. Because no one else has an interest in enforcing the servitude, the servitude terminates." (Rest.3d Property, Servitudes, § 7.5, com. a, p. 366, italics added.) The easement is extinguished because it is superfluous, and the common owners are also thereby freed later to convey the formerly servient land free of such restraints, or may elect to burden it once again by reservation of a new easement.

Consistent with this rationale, when Sommer and Dunham owned both 66 and 60 Clarendon, the 1981 view easement served no purpose because Sommer and Dunham did not require an easement to make use of 60 Clarendon in the manner provided by the 1981 view easement. Nor did anyone else have an interest in enforcing the easement if they instead chose to develop 60 Clarendon in a manner that disregarded the restriction, or sold it to someone else free of the restriction. As the owners of both lots, they could choose to develop 60 Clarendon in a manner that preserved their view, hold it undeveloped, or even exercise their right to develop 60 Clarendon in a manner that interfered with the view from 66 Clarendon. If they chose to sell 60 Clarendon to anyone else, they could protect their view by creating and reserving a new easement for the benefit of 66 Clarendon, or they could elect not to impose such restriction and sell it at a price reflecting the highest and best possible use for the lot. Therefore, extinguishment of the 1981 view easement by merger served their interest as the owners of both the dominant and servient tenement in making whatever use they chose of their own property, and did not adversely affect anyone else's property interest in enforcing the easement.

Zanelli argues that this rationale for extinguishment of an easement does not apply when the common ownership of a dominant and servient tenement is shared by cotenants because they might disagree about how to use their property. He reasons that, despite common ownership of the dominant and servient parcels, an easement is not superfluous in these circumstances because it could serve the purpose of protecting a cotenant from another cotenant who might interfere with or object to the use the easement allows or requires. The mere possibility that cotenants who commonly own a formerly dominant and servient tenement might disagree on how to use their property is, however, an independent problem, better addressed by established remedies of one cotenant against another, including partition.

■ The cases Zanelli cites also do not support his contention that extinguishment by merger is inapplicable when ownership of the right to the servitude and to the servient tenement is vested in a group of persons, rather than one person. Although *Leggio v. Haggerty* (1965) 231 Cal.App.2d 873, 881–882 [42 Cal.Rptr. 400] (*Leggio*), and *Signorelli v. Edwards* (1932) 120 Cal.App. 614, 620 [8 P.2d 194] (*Signorelli*) do recite the general rule of extinguishment of an easement by merger in terms of the vesting of these rights in the "same person," the facts did not require the court, in either case, to decide whether the same principle applies when a group of persons holds these rights. In *Leggio*, the court addressed the very different question whether, when an easement benefits more than one parcel of property, the acquisition by one person of title to the servient tenement and a release or quitclaim deed of the easement from some, but not all, owners of the dominant parcels extinguishes the rights of the owners of the other dominant parcels. The court concluded that the easement rights of the owners of other dominant parcels were not extinguished. (*Leggio*, at pp. 881–884.) This holding merely illustrates the principle that the easement is extinguished only when the owner of the servient tenement acquires "the right to the servitude" with respect to *all* of the dominant tenements.

In *Signorelli, supra*, 120 Cal.App. 614, the facts did involve potential co-ownership by two brothers of the "right to the servitude" and the "right to the servient tenement," when at one point they had contracts to purchase both the dominant and servient tenements. (§ 811.) The court, however, never had to reach the question whether merger could apply when the same two persons own the right to the servitude and the servient tenement, because ultimately only one brother bought the dominant tenement, and the servient tenement continued to be owned by other individuals. Therefore, the court found the right to the servitude and to the servient tenement were not united in even one person, and the easement was not extinguished by merger. (*Signorelli*, at pp. 620–621.)

Zanelli also cites one decision from another state, *Cowan v. Carnavale* (N.Y.App.Div. 2002) 300 A.D.2d 893 [752 N.Y.S.2d 737] (*Cowan*), as support for his proposition that extinguishment by merger does not apply when a group of persons, rather than one individual, owns the dominant and servient estates.[8] In *Cowan*, at the time of the claimed extinguishment by merger in 1988, a husband and wife owned the servient tenement as tenants in common *with a third person*. In that year, husband and wife also acquired

---

[8] Although we have found no California decision applying the principle of extinguishment of an easement where the dominant and servient tenement are owned by the same two people, we have found at least one out-of-state decision that did: In *Breliant v. Preferred Equities Corp.* (1966) 112 Nev. 663, 667 [918 P.2d 314], the court held an easement was extinguished " 'when Laird and Fisher, who owned what is now the Breliant Property, also acquired what is now the PEC Property. Laird and Fisher held both the dominant (the PEC Property) and the servient

title to the dominant tenement as tenants by the entirety,[9] and gave the wife's father a purchase money mortgage because he provided funds for the transaction. After the husband and wife defaulted on the loan, the father foreclosed and became the owner of the dominant estate. The father then sued to establish his right to use the easement. The court rejected the defendants' contention that the easement had been extinguished in 1988. Its reason for finding no merger was not that title to the dominant and servient tenements was held by a group of persons as tenants in common or tenants by the entirety, but rather that the *same* group of persons did not own *all* of the interests in the dominant and servient tenements: Although the husband and wife acquired title in fee simple to the entire dominant tenement, the husband and wife together owned only a *fractional share* of the servient property, not the entire estate. In this factual context the court stated: "[W]hen both the dominant and servient estates are *entirely* owned by the same person, the easement is extinguished by the doctrine of merger [citations]. Simply, under those circumstances, the easement serves no purpose because the owner may use either estate freely [citation]. Significantly, however, 'merger is not effective, and an easement is not extinguished as a result of the merger, if the person owning both the dominant and servient estates only holds title to the servient tenement as tenant in common with another. He must own the entire title to both lots in fee if the easement is to terminate by merger. . . .' " (*Cowan*, 752 N.Y.S.2d at pp. 739–740, italics added.) Zanelli takes this quote out of context for his contention that merger cannot occur when more than one person owns the dominant and servient tenements as tenants in common or any other form of cotenancy. Yet, the court's actual holding was not based upon the fact that interests in the dominant and servient tenements were held as cotenants. Rather, it held that no merger occurred because the husband and wife were not the *only* owners of the servient tenement and therefore did not own the *entirety* of both the dominant and servient tenements. (*Id.* at p. 740.) In fact, the *Cowan* court recognized that extinguishment by merger *could* apply when the same *two* people own the entirety of the dominant and servient tenements, because it went on to state that in 1993, when the third person conveyed all his interest in the servient estate to the husband and wife, they "*did* acquire the requisite unity of title" for extinguishment by merger, but that the easement nonetheless was not extinguished because of an exception that protects the interests of a mortgagee. (*Ibid.*, italics added.) This exception precludes merger to protect the interest of a mortgagee of the

---

(the Breliant Property) tenements in common ownership, and thus the First Easement merged into the fee of the Breliant Property and terminated." (*Breliant*, 918 P.2d at p. 317.)

[9] Tenancy by the entirety is a common law form of joint tenancy between a husband and wife. This form of title no longer exists under California law. Instead section 683 enumerates the following types of ownership by several persons: joint interests, partnership interests, interests in common, and community interest between husband and wife.

dominant estate in preserving an easement "otherwise extinguished when fee title to the dominant estate and fee title to the servient estate have been united in one fee owner." (*Ibid.*)

■ In sum, nothing in the plain language of section 811, or in the cases cited by defendant, precludes finding extinguishment by merger when ownership of the right to the servitude and to the servient tenement is united in the same person, or *persons.*

2. *Effect of Ownership of 66 Clarendon as Joint Tenants and 60 Clarendon as Tenants in Common with Dunham's Title Held as Trustee for His Revocable Trust.*

■ " ' "In order that an easement will be extinguished under the doctrine of merger, there must be unity of title[10] . . . . [T]he owner should have a permanent and enduring estate, an estate in fee, in both the dominant and servient estate, not liable to be disjoined again by operation of law. . . . Further, the ownership of the two estates should be coextensive and equal in validity, quality, and all other circumstances of right." ' " (*Beyer, supra,* 129 Cal.App.4th at pp. 1473–1474.) The requirement that the ownership of the

---

[10] In the context of discussing extinguishment of an easement by merger, the courts often use the phrase "unity of title" as shorthand for the requirement that ownership of the right to the servitude and to the servient tenement be "united" in the same person. (See, e.g., *Beyer, supra,* 129 Cal.App.4th at p. 1473 [" ' "[i]n order that an easement will be extinguished under the doctrine of merger, there must be *unity of title* . . ." ' " (italics added)].) We prefer to adopt the shorthand "unity of ownership," which is the phrase used in the Restatement of Property and in *Renden, supra,* 253 Cal.App.2d at page 587, footnote 7 (see Rest., Property, § 497 ["An easement . . . is extinguished by *unity of ownership* . . ." (italics added)]; see also Rest.3d Property, Servitudes, § 7.5 ["A servitude is terminated when all the benefits and burdens come into a *single ownership*" (italics added)]) because "unity of title" can be confused with a term of art used to describe one of the four unities that were necessary at common law for the creation of a joint tenancy: unity of interest, time, *title,* and possession. (See *Estate of Propst* (1990) 50 Cal.3d 448, 455 [268 Cal.Rptr. 114, 788 P.2d 628].) When used in the context of creation of a joint tenancy at common law, "unity of title" means that, in addition to acquiring "their interests at the same time (unity of time)," joint tenants had to acquire their interest "by the same conveyancing instrument (*unity of title*)." (*Riddle v. Harmon* (1980) 102 Cal.App.3d 524, 527 [162 Cal.Rptr. 530], italics added.) Unity of title in this latter sense is *not* required for extinguishment of an easement by merger. If it were, then an easement would not be extinguished, for example, when an owner of a dominant tenement acquires the servient tenement by a separate subsequent conveyance, because title to both the dominant and servient tenement would not have been conveyed by the same instrument. Yet, subsequent acquisition of the servient tenement by the owner of the dominant tenement is the classic circumstance in which the principle of extinguishment by merger is applied. In the context of extinguishment by merger, the use of the phrase "unity of title" means that ownership of the "right to the servitude" and the right to the servient tenement must be *united in the same person or group of persons,* that the owner have an estate in fee simple in both the dominant and servient tenements and a present possessory interest, and own the entirety of the interest in the dominant and servient tenement estate, not merely a fractional share.

dominant and servient tenement be "permanent and enduring" and "coextensive and equal in validity" means that the unity of ownership must be of a fee simple absolute estate in both the dominant and servient tenements, and that the common ownership is of the entire dominant and servient tenement, not merely a fractional share. Thus, for example, where one person has fee simple absolute estate in either the dominant or servient tenement and a lesser estate in the other, such as a leasehold or life estate, the easement may only be suspended for the duration of the lesser estate, and is revived when the lesser estate terminates. (See *Renden, supra*, 253 Cal.App.2d at p. 587, fn. 8 ["an easement is not extinguished by merger if the estates in possession in both the dominant and servient tenements, acquired by one person, are such in character that one will or may terminate before the other. In such a case the easement is merely suspended and liable to revive when one of the two estates terminates"]; see also Rest., Property, § 497, com. d, pp. 3065–3066.) Similarly, if the fee ownership of either the dominant or servient tenement is subject to a power of termination, reversion or executory interest, the future nonpossessory interests are unaffected by merger. If they become possessory, the possessory estate is entitled to the benefit, or remains subject to the burden of the easement. (See Rest.3d Property, Servitudes, § 7.5, com. d, p. 368 ["*Merger does not take place if there are any outstanding interests in the servitude.* So long as there are any outstanding interests in the property or estate benefited or burdened by the servitude, merger does not take place. If the outstanding interests are future rather than present interests, and the owner of the future interest has no right to present enjoyment of the servitude[,] the servitude is suspended until the future interest becomes possessory."].)

 Extinguishment of an easement by merger also does not occur unless the common owner has present possessory interests in both the dominant and servient estates. For example, when one person owns fee simple title to two parcels, leases one parcel to another, and as the owner of the other holds an easement across the leased property for parking, no merger occurs to extinguish the easement because the owner does not have a present possessory interest in the servient parcel. In these circumstances, because of the absence of the right to present possession, the owner of the servient parcel would not be entitled to park on it absent the easement, and the easement therefore the easement not extinguished. (*Renden, supra*, 253 Cal.App.2d at pp. 587–588.)

Moreover, even when common ownership of a fee simple absolute estate exists in both the dominant and servient tenements, that ownership must be of the *entire* dominant and servient tenements and not merely a fractional share. For example, in *Leggio*, where an easement benefited more than one parcel, common ownership of all of the servient tenement and a release or quitclaim deed of any interest in an easement from the owners of some, but not all of the dominant parcels, did not result in merger extinguishing the rights of the

owners of other dominant parcels. (*Leggio, supra*, 231 Cal.App.2d at pp. 881–884; see also *Crease v. Jarrell* (1924) 65 Cal.App. 554, 560 [224 P. 762] [acquisition by lumber company of servient lot across which an alley ran and *one* of several abutting lots with appurtenant easements entitling the owner to use the alleyway did not extinguish the easement because the common ownership did not include *all* of the dominant tenements].) The court in *Cheda v. Bodkin* (1916) 173 Cal. 7 [158 P. 1025], applied this same principle to find no extinguishment of an easement providing a property known as the Foster ranch access to water from the Molinari ranch when one person for a time owned both the Foster and Molinari ranches, because that person "held her water rights in the Molinari tract in common with others." (*Id.* at pp. 16–17.)

None of the foregoing circumstances precluding merger exist in this case. Here, Sommer and Dunham each acquired fee simple absolute estates with respect to both 60 and 66 Clarendon. Although they shared ownership of 60 and 66 Clarendon as cotenants, together they owned *all* the interests in both the dominant and servient tenements because they each held an undivided half interest in 60 Clarendon as tenants in common and an undivided half interest in 66 Clarendon as joint tenants. No other person held a fractional share of either property.

Nevertheless, Zanelli maintains that the existence of a right of survivorship only with respect to 66 Clarendon, and the fact that Dunham's undivided half interest in 60 Clarendon was held as a tenant in common in his revocable inter vivos trust, rendered the estates held in both properties unequal in duration. He reasons the estates are unequal because, as a result of the right of survivorship incident to the joint tenancy, upon Dunham's death his interest in 66 Clarendon would pass automatically to Sommer, whereas Dunham's interest in 60 Clarendon would be disposed of under the terms of his trust. He concludes the commonly held estates were of different durations because the joint tenancy essentially converted his estate in 66 Clarendon from a fee simple to the functional equivalent of a life estate that would terminate upon his death, whereas the undivided half interest held in the revocable inter vivos trust was an estate in fee simple absolute that would not terminate upon his death, and would pass to his designated beneficiaries.

 The right of survivorship is the distinguishing feature of a joint tenancy. (*Zeigler v. Bonnell* (1942) 52 Cal.App.2d 217, 219 [126 P.2d 118].) In all other respects, the rights of tenants in common and joint tenants with respect to property are the same. The existence of the right of survivorship has caused joint tenancy sometimes to be described as "a specialized form of a life estate, with what amounts to a contingent remainder." (*Id.* at p. 220.) If a person acquires only a life estate in either the dominant or servient

tenement and fee simple title to the other, the estates are unequal and the easement is either not extinguished, or is extinguished only for the duration of the lesser estate. (See *Renden, supra*, 253 Cal.App.2d at p. 588.) Yet the existence of a right of survivorship incident to joint tenancy does not create a true joint life estate with a remainder person who holds an enforceable property interest. (See *Hart v. Kanaye Nagasawa* (1933) 218 Cal. 685, 688–699 [24 P.2d 815] [conveyance to joint tenants was of a fee simple estate, and merely describing the estate in the habendum clause as a joint tenancy does not convey the lesser estate of a joint life estate with contingent remainder to the survivor].) ■ A life estate terminates upon death by operation of law. The holder of a life estate therefore has no interest to devise by will. ■ Joint tenants holding fee simple title may, at any time, without the consent of their cotenent, defeat the right of survivorship by severing the cotenancy, and devise their interest upon death. "The common law recognizes the right of a joint tenant to sever the joint tenancy, without the knowledge or consent of the other joint tenants, by conveyance or other acts inconsistent with the continuance of one of the essential unities. [Citations.] Severance of the joint tenancy converts the joint tenancy into a tenancy in common. [Citation.] Because a tenant in common also has an undivided fractional interest in the property [citation], the unilateral severance of the joint tenancy by a joint tenant does not deprive other joint tenants of their fractional shares." (*Estate of Propst, supra*, 50 Cal.3d at pp. 455–456.) ■ Since the right of survivorship may be defeated by the unilateral act of a joint tenant, "[t]he right of survivorship has been described as 'a mere expectancy that arises "only upon success in the ultimate gamble—survival— and then only if the unity of the estate has not theretofore been destroyed . . . by any . . . action which operates to sever the joint tenancy." [Citation.]' " (*Estate of Mitchell* (1999) 76 Cal.App.4th 1378, 1392 [91 Cal.Rptr.2d 192].) " 'The term expectancy describes the interest of a person who merely foresees that he might receive a future beneficence . . . . [T]he defining characteristic of an expectancy is that its holder has no *enforceable right* to his beneficence.' " (*Ibid.*) Therefore, the right of survivorship does not actually convert an indeterminate fee simple estate held by joint tenants into an estate of lesser duration. In this way, joint tenants, just like tenants in common, may convey their interest during their lifetime, or devise it upon their death. The only consequence of the exercise of that right will be conversion of the form of cotenancy to a tenancy in common.

In his reply brief, Zanelli argues that holding title to the dominant tenement as joint tenants and to the servient tenement as tenants in common precludes merger because creation of a tenancy in common does not require "unity of title," time or interest; mere unity of possession suffices. A tenancy in common therefore may be created by more than one conveyancing instrument, and the interests tenants in common acquire may consist of different

fractional shares or estates of different durations. (See *Carpentier v. Webster* (1865) 27 Cal. 524, 545.) Zanelli reasons that "where one parcel is held by one title [as joint tenants] and the other by several titles [as tenants in common], there is not *unity* of title . . . ." and therefore no extinguishment by merger. This argument confuses "unity of title" as used in the context of creation of joint tenancies to describe an estate created by a single convey-ancing instrument, with its use in the context of extinguishment of easements by merger as shorthand for the requirement that *ownership* of the right to the servitude and to the servient tenement be *united in the same person.* (See fn. 10, *ante.*)

Sommer and Dunham, in fact, acquired their interests in 60 Clarendon at the same time, by the same conveyancing instrument, and the interests they acquired as tenants in common, like their interest as joint tenants in 66 Clarendon, consisted of equal undivided half interests in the fee simple estate. Therefore, ownership of the "right to the servitude" and the right to the servient tenement was *united in the same person or group of persons.* Sommer and Dunham had a present possessory interest consisting of an estate in fee simple in both the dominant and servient tenements, and they owned the entirety of the interest in the dominant and servient tenement estate, not merely a fractional share. This is exactly the "unity of title," or as we prefer, the "unity of ownership," required for finding an easement extinguished by merger.

We conclude that regardless of whether Sommer and Dunham held title as joint tenants or tenants in common, the estates they acquired with respect to 66 Clarendon and 60 Clarendon were equal, consisting of an undivided half interest in fee simple absolute.[11]

 Nor does the fact that Dunham held his interest in 60 Clarendon as trustee for his inter vivos revocable trust preclude merger on the theory that

---

[11] Zanelli also cites the following language from a court of another state: " '[I]f there is a single trustee and he is also sole beneficiary, the legal interest may well be a legal fee simple owned in severalty and the equitable interest may be an equitable fee simple owned in severalty. Hence the stage may be set for merger. But if there are two or more trustees or two or more beneficiaries a diversity arises. The two or more trustees hold their interest (generally legal) as joint tenants, title vesting in them as a unit, while the beneficiaries hold their equitable interests as tenants in common in almost all cases. This slight difference in the character of legal and equitable interests may justify the refusal to apply merger. Even if A and B hold a legal fee as trustees for A and B who have the complete equitable interest, the difference between joint tenancy and tenancy in common may be sufficient grounds for not applying the doctrine of merger.' " (*First Alabama Bank of Tuscaloosa v. Webb* (Ala. 1979) 373 So.2d 631, 635.) Apart from the fact that this decision applies merger in the context of creation of a trust, not extinguishment of an easement by merger, the observation that "the difference between joint tenancy and tenancy in common may be sufficient grounds for not applying the doctrine of merger" to defeat creation of trust is dicta, and not supported by any further analysis.

he held title only in a representative capacity, and did not actually own the property. If Dunham held title to 60 Clarendon only in a representative capacity as a trustee for other beneficiaries under the terms of an irrevocable trust, then his ownership also of 66 Clarendon might not result in extinguishment by merger because he would only hold the legal title for the benefit of others. (See Rest., Property, § 497, com. e, p. 3067.)[12] However "[t]he doctrine of extinguishment of easements by unity of ownership is one of substance rather than of form." (*Ibid.*) ■ Under California law, a revocable inter vivos trust is recognized as simply "a probate avoidance device, but does not prevent creditors of the settlors—who are often also the trustees and the sole beneficiaries during their lifetimes—from reaching trust property." (*Galdjie v. Darwish* (2003) 113 Cal.App.4th 1331, 1349 [7 Cal.Rptr.3d 178] (*Galdjie*).) Thus, in *Galdjie,* the court held an action for specific performance seeking to compel the settlors/trustors to convey title to property held in an inter vivos trust was not fatally defective for failing to name the settlors/trustees in their representative capacity as well as their individual capacity. The court reasoned that the settlors in their individual capacity had full power to convey the property because a revocable inter vivos trust was merely a probate avoidance device, and does not prevent creditors of the settlors who were also the trustees and sole beneficiaries during their lifetime, from reaching trust property. (*Id.* at p. 1349; see also *Gagan v. Gouyd* (1999) 73 Cal.App.4th 835, 842 [86 Cal.Rptr.2d 733], disapproved on other grounds in *Mejia v. Reed* (2003) 31 Cal.4th 657, 669 [3 Cal.Rptr.3d 390, 74 P.3d 166] [transfer of property to revocable trust was not a fraudulent conveyance because it did not *dispose of or part with an asset,* and the property was still reachable by creditors].) ■ Property transferred to, or held in, a revocable inter vivos trust is nonetheless deemed the property of the settlor and is reachable by the creditors of the settlor. (See Prob. Code, §§ 18200, 18201.) These sections recognize that when property is held in this type of trust, the settlor and lifetime beneficiary " 'has the equivalent of full ownership of the property.' " (*Walgren v. Dolan* (1990) 226 Cal.App.3d 572,

---

[12] Restatement of Property, section 497, comment e, page 3067, states: "The doctrine of extinguishment of easements by unity of ownership is one of substance rather than of form. When an interest in either a dominant or a servient tenement is held in a representative capacity, as by a trustee or an executor, a unity of the interest with the ownership of an estate in the other tenement involved will not extinguish the easement existing between the two tenements. Likewise, if interest in each of a dominant and a servient tenement are held in representative capacities, a unity of the representative interests will not result in an extinguishment of the easement existing between the two tenements. Thus, if the title to both a dominant and a servient tenement is united in a single trustee who holds for different beneficiaries, such a unity of title does not extinguish the easement." Comment e to illustration 7 from section 497 highlights the differences we draw. This comment posits interests held by a single trustee for two distinct beneficiaries, which is not the case of Dunham who in essence holds for himself while owning both properties in common with Sommer.

578 [276 Cal.Rptr. 554] *(Walgren).)* We conclude that despite nominally holding title as the trustee for his inter vivos revocable trust, Dunham had " 'the equivalent of full ownership' " of the property. *(Ibid.)*[13]

In sum, the estates Sommer and Dunham held as joint tenants in 66 Clarendon and tenants in common of 60 Clarendon were coextensive and equal in validity: They held the fee simple absolute estates as to both properties. The fact that their cotenancy with respect to 66 Clarendon was as joint tenants did not convert their interest in that land merely to a life estate with a contingent remainder. Sommer and Dunham also did not own only a fractional share of the dominant and servient tenements. They each held an undivided half interest in 60 and 66 Clarendon, so that together they held the entirety of interests in both properties. There were no durational limits on their estate, no reversionary or executory interests, and no leaseholds granted to others. Therefore, their estates in both the dominant and servient tenement were equal in duration. Nor did the fact that Dunham held title to 60 Clarendon as trustee for his revocable inter vivos trust mean that he should not be deemed the owner of that property, because California law recognizes that when property is held in this type of trust the settlor " 'has the equivalent of full ownership of the property.' " *(Walgren, supra,* 226 Cal.App.3d at p. 578.) We conclude that when Sommer and Dunham acquired both the right to the servitude as owners of 66 Clarendon, and the right to the servient tenement as owners of 60 Clarendon, these rights were united in the same persons, no one else had an interest in enforcing the 1981 view easement, and it thereby was extinguished. (§§ 811, 805.)

### 3. *Revival of the Extinguished Easement Upon the Sale to McGrath.*

 Zanelli incorrectly asserts that, if extinguished, the easement was nonetheless revived when 60 Clarendon was sold to McGrath. An easement once extinguished "does not come into existence again merely by severance of the united estates. . . ." (Rest., Property, § 497, com. h, p. 3069.) It must either be "newly created" by "an express stipulation in the conveyance by which the severance is made or from the implications of the circumstances of the severance." *(Ibid.;* see also Rest.3d Property, Servitudes, § 7.5, com. b,

---

[13] Although Zanelli does not rely upon it, we acknowledge that in *Beyer, supra,* 129 Cal.App.4th 1458, the court held that a person who retains a beneficial interest in property but conveys legal title to another person or entity as trustee, is not the owner of the property for the purpose of applying section 805, because that person does not have both legal and equitable title to the property. (129 Cal.App.4th at pp. 1473–1474.) Here, however, Dunham did not convey legal title to a *third party* as trustee, but rather took title *himself* as trustee. Moreover, in *Beyer* the trust was an irrevocable trust *(id.* at p. 1467), whereas here the trust was a revocable inter vivos trust, meaning that the settlor/trustee, for all intents and purposes, owned the assets held in trust.

p. 366.) The act of severance alone does not revive the extinguished easement. Sommer and Dunham did not attempt expressly to recreate the 1981 view easement in the conveyance to McGrath. The court found that the deed to McGrath contained no reference at all to a view easement. It further found that if Sommer and Dunham intended to revive the 1981 view easement when Dunham conveyed his interest in 66 Clarendon to Sommer, their attempt was ineffective.[14] Nor are the circumstances appropriate for implication of a reservation of a servitude upon severance. ██ An implied reservation of an easement may be inferred only where there is an obvious ongoing use that is reasonably necessary to the enjoyment of the land granted. (§ 1104; *Tusher v. Gabrielsen* (1998) 68 Cal.App.4th 131, 141 [80 Cal.Rptr.2d 126].) Here, the court found no such obvious ongoing use existed, and its finding is amply supported by the evidence that there were no structures at all on 60 Clarendon.

The language Zanelli cites in *Renden* does not support his assertion that the 1981 view easement, if extinguished, was revived upon the sale of 60 Clarendon to McGrath. The cited language merely recognizes that an easement is not extinguished, but rather "is merely suspended and liable to revive" upon termination of a lesser estate if, for example, a person acquires an estate in fee simple in the dominant tenement but only a life estate in the other. (*Renden, supra*, 253 Cal.App.2d at p. 587, fn. 8.) The estates Sommer and Dunham held in both 60 and 66 Clarendon were of equal duration. Therefore the cited language has no application to these facts. The 1981 view easement was extinguished, not suspended. *Renden* does not even address the question whether an extinguished easement is revived by an act severing the previously united ownership of the dominant and servient tenements.

The other two cases Zanelli cites are also inapposite. In *Dixon v. Schermeier* (1895) 110 Cal. 582, 585–586 [42 P. 1091], the court discussed factual circumstances warranting a finding of an implied easement that arose upon severance of formerly dominant and servient tenement by "implication of law." But *Dixon* did not hold that the act of severance alone would revive an extinguished easement. Finally, in *Camp Meeker Water System, Inc. v. Public Utilities Com.* (1990) 51 Cal.3d 845, 865 [274 Cal.Rptr. 678, 799 P.2d 758] (*Camp Meeker*), the court, in the context of determining whether a deed conveyed an easement across an adjacent parcel, merely acknowledged that

---

[14] Although the court does not state its reasons for finding the attempt ineffective, we note that instead of including the language of the 1981 view easement defining its scope, the 1998 deed from Dunham to Sommer merely references an easement "for receiving light, air, and view." Therefore, even if the deed did create a new easement, it was not the same in scope as the 1981 view easement, and Zanelli asserts in his closing brief that he does not seek to enforce this easement but rather seeks to enforce the 1981 view easement recorded by Sommer and Dunham's predecessors, which was extinguished by merger.

intent to create such an easement might be inferred on a theory of "revival of an easement existing prior to merger of the dominant and servient estates" if facts existed to support a finding that such an easement had existed prior to the common ownership.[15] (*Camp Meeker*, at p. 865.) Again, the court did not hold that an extinguished easement is revived upon severance absent an express stipulation in the conveyance, or a factual basis for implying reservation of an easement in favor of the grantor.

### 4. *Sufficiency of Evidence to Support Finding of Intent and Weighing of Equities.*

Zanelli next contends no substantial evidence supports the court's finding that Sommer and Dunham intended the 1981 view easement to be extinguished by merger, and the court's conclusion that the equities weighed in favor of McGrath and therefore it would not enforce the 1981 view easement on equitable grounds. The court made factual findings on the issue of intent and weighed the equities because Zanelli urged the court to find the easement was not extinguished by merger either because Sommer and Dunham did not intend the easement to be extinguished, or because it would be inequitable to apply the doctrine of merger on these facts.

To support his contention that the court must consider the property owners' intent and weigh the equities, Zanelli relied upon the following language in *Kolodge v. Boyd* (2001) 88 Cal.App.4th 349 [105 Cal.Rptr.2d 749] (*Kolodge*): " '[T]he union of a lesser and greater estate does not always result in a merger. *The doctrine of merger is applied only where it prevents an injustice and serves the interests of the person holding the two estates, in the absence of evidence of a contrary intent.* It is not applied where it results in an injustice, injury, or prejudice to a third person. . . .' . . . [¶] Whether there has been a merger depends not just on the equities, but also the intent of the parties, which presents a question of fact. [Citations.] While it is presumed that there is no merger where merger would work an inequity, the presumption against merger can be overcome by evidence that the parties intended a merger upon the union of two or more estates . . . ." (*Id.* at p. 362.) He also relied upon the following language in *Ito v. Schiller* (1931) 213 Cal. 632, 635 [3 P.2d 1]: " '. . . Equity will prevent or permit a merger, as will best subserve the purposes of justice, and the actual and just intent of the parties. . . . In the absence of an expression of intention, if the interest of the person in whom

---

[15] The principle the *Camp Meeker* court (51 Cal.3d 845) was referring to is reflected in the Restatement Third of Property as follows: "If the circumstances are otherwise appropriate for creation of a servitude by implication, the fact that the servitude previously existed may warrant the inference that the parties intended to re-create it on severance." (Rest.3d Property, Servitudes, § 7.5, com. b, p. 366.)

the several estates have united, as shown from all the circumstances, would be best subserved by keeping them separate, the intent so to do will ordinarily be implied.' " Although neither of the foregoing authorities involved the application of the general doctrine of merger to extinguishment of easements in real property, for the purpose of analysis of Zanelli's remaining contentions we shall accept arguendo the proposition that the common owners' intent is relevant in the context of a claim of extinguishment of an easement, and that the court has the equitable power to find no merger and enforce the easement.

Substantial evidence supports the court findings on the issue of Sommer and Dunham's intent. (See *Kolodge, supra*, 88 Cal.App.4th at p. 362 [intent is an issue of fact].) The court either discredited altogether, or assigned minimal weight to, the testimony of Sommer and Dunham. It noted that although their testimony might otherwise be the most persuasive evidence of their intent, the value of their testimony "diminishes significantly" in light of their self-interest in the context of the dispute. Instead, the court chose to infer their intent from their conduct. It reasoned that their act of leaving 60 Clarendon undeveloped was "more consistent with" intent to extinguish the easement because the absence of any structure on 60 Clarendon simultaneously preserved their "enjoyment of unrestricted views" *and* the option to eventually sell 60 Clarendon at a price reflecting the highest and best use of the property free of any restriction. The court further reasoned that there was no factual basis to imply a contrary intent, because the property interests of Sommer and Dunham as owners of both 66 and 60 Clarendon were well served by extinguishing the easement: It was unnecessary while the properties were commonly owned and, in the event of a future sale, Sommer and Dunham were free to decide whether to once again burden 60 Clarendon, or to sell it free of such restrictions. The court concluded that Sommer and Dunham must have intended the easement to be extinguished. Zanelli argues that the court's reasoning in support of this inference was illogical because, by not developing 60 Clarendon, Sommer and Dunham could just as well have intended to hold the lot and later sell it to someone who could build to suit within the restrictions of the 1981 view easement. This argument only demonstrates the existence of another reasonable inference, not that the inference the court drew was unreasonable.[16]

---

[16] In a similar vein, Zanelli argues that, even if the court assigned only slight weight to Sommer's and Dunham's testimony, their testimony was at least *some* evidence of intent *not* to merge, and, he asserts, there was *no evidence* of intent *to* merge. He reasons that the court should therefore have found McGrath failed to carry his burden of proof on this issue. This argument fails because, although there was no *direct* evidence that Sommer and Dunham intended merger, the court's finding is supported by the circumstantial evidence we have just summarized, and the reasonable inferences the court drew from their conduct.

Zanelli also challenges the trial court's conclusion that it would not enforce the 1981 view easement on equitable grounds, because the equities weighed in favor of McGrath. We review the court's exercise of its equitable powers "under the abuse of discretion standard. [Citations.] Under that standard, we resolve all evidentiary conflicts in favor of the judgment and determine whether the court's decision ' "falls within the permissible range of options set by the legal criteria." ' " (*Hirschfield v. Schwartz* (2001) 91 Cal.App.4th 749, 771 [110 Cal.Rptr.2d 861].)

The court found that at the time McGrath made his offer to purchase the property he did so without knowledge of the existence of an easement. Sommer and Dunham advertised the property without reference to any view easement and there was no mention of the easement until after he made the offer. The court further found that during the contingency period Sommer and Dunham made "less than full disclosure" concerning the scope of the 1981 view easement. Moreover, "[t]here was no visible use upon the land to suggest the existence of any easement." Upon learning an easement had existed, McGrath and his attorney consistently maintained that the 1981 view easement was either too uncertain to be enforced or had been extinguished by merger. The court stated that, as between Sommer and Dunham and McGrath, it would have no difficulty finding the equities were in McGrath's favor. As between Zanelli and McGrath, it found the equities still favored McGrath. It reasoned that when McGrath made his offer he was not aware of the 1981 view restriction, and although McGrath did eventually become aware of the claimed easement, he consistently maintained his position that it was extinguished. Equitable enforcement of the claimed restriction would cause hardship for him because although he "could build a marketable house . . . within the envelope of the 'view' easement[,] . . . it would be a home far inferior to that which he desires to build." Zanelli, on the other hand, purchased "with full notice of the conflict" and was "advised by his real estate agent regarding the possible invalidity of the 'view' easement due to merger . . . [and] purchased the property at a discount in exchange for taking that risk."

Zanelli asserts that the equities were actually in his favor because the finding that the easement was extinguished by merger deprived him "of a right which both he and his predecessors *expected to exist and which was reflected in his purchase price,*" whereas "McGrath was *fully aware* of the View Easement and negotiated a significant discount to account for it" (italics added). Yet the court found, upon conflicting evidence, that McGrath was *not* fully aware of the 1981 view easement and its scope until after the contingency period, and did *not* find that McGrath purchased the property at a lower price reflecting the burden of the easement. It further found it was Zanelli who purchased "with full notice of the conflict," and that he was "advised by his real estate

agent regarding the possible invalidity of the 'view' easement due to merger . . . [and] purchased the property at a discount in exchange for taking that risk." We defer to the court's resolution of the conflicting evidence as to the underlying facts, and find no abuse of discretion with respect to its weighing of these relative equities. The court reasonably concluded that applying merger "served the interests of the person[s] holding the two estates" because during the period of common ownership, Sommer and Dunham were free to use 60 Clarendon in whatever way they wished. It also reasonably concluded that application of merger would not work an injustice as between Sommer and Dunham and McGrath, based upon its findings that McGrath made his offer to purchase without knowledge of the existence of an easement, and, by advertising the property without reference to any view easement, Sommer and Dunham implied the absence of any restrictions, and then made "less than full disclosure" concerning the scope of the 1981 view easement during the contingency period. It was reasonable to conclude that as between Zanelli and McGrath, the equities still favored McGrath, because enforcing the 1981 view easement would cause hardship for him since a house built "within the envelope of the 'view' easement . . . would be a home far inferior to that which he desires to build," whereas Zanelli purchased "with full notice of the conflict" and was "advised by his real estate agent regarding the possible invalidity of the 'view' easement due to merger . . . [and] purchased the property at a discount in exchange for taking that risk."

In conclusion, we hold that the 1981 view easement was extinguished when Sommer and Dunham acquired the "right to the servitude" as the fee simple owners of 66 Clarendon and the "right to the servient tenement" as the fee simple owners of 60 Clarendon, and the easement was not revived when Sommer and Dunham sold 60 Clarendon to McGrath. Substantial evidence supports the court's finding that Sommer and Dunham intended the 1981 view easement to be extinguished. The court also was within its discretion to decline Zanelli's request for equitable enforcement because it reasonably concluded that the equities weighed in favor of McGrath.

In light of the foregoing holding, it is not necessary to reach the merits of the court's alternative ground for entering judgment in McGrath's favor that, by failing to reserve or except the 1981 view easement, the deed from Sommer and Dunham to McGrath conveyed all Sommer's right, title and interest in 60 Clarendon, including the easement, thereby extinguishing it.[17]

---

[17] Therefore, we need not decide whether *Taylor v. Avila* (1917) 175 Cal. 203 [165 P. 533] has been repudiated, as was urged at oral argument.

Conclusion

The judgment is affirmed. Costs are awarded to respondent.

Margulies, J., and Needham, J., concurred.