Filed 2/6/14  Keller v. Donegan CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# COPY

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

## (Nevada)

----

| | |
|---|---|
| GABRIEL KELLER, | C068967 |
| Plaintiff, Cross-defendant and Appellant, | (Super. Ct. No. 74867) |
| v. | |
| CHRIS DONEGAN, | |
| Defendant, Cross-complainant and Respondent. | |

This appeal arises out of a dispute between two former friends over the existence and scope of an easement across one man's property allowing access to the otherwise landlocked property of the other.

Defendant Chris Donegan owned a 40-acre parcel of real property in Nevada County.  He purchased a 38-acre parcel directly north of his land for the purpose of

1

conveying it immediately to plaintiff Gabriel Keller, who moved onto the property and made payments directly to the seller. Over time, Keller began to restrict and eventually prohibit altogether Donegan's previously unobstructed use of the easement over Keller's property by changing the locks on the gates and placing obstacles across the easement to prevent passage. After the dispute culminated in several confrontations at the gate, Donegan and Keller became embroiled in litigation. Following a bench trial and a hearing on Keller's objections to the initial statement of decision, the trial court entered judgment finding an easement in favor of Donegan, the scope of which was as described in deeds recorded in 1969 and 1970.

On appeal, Keller contends the trial court erred by relying on the 1969 and 1970 deeds to define the scope of the easement, as any easement described in those deeds was extinguished by merger when Donegan's property and Keller's property came under common ownership. He argues that, even assuming an easement was created by implication when Donegan conveyed the property to Keller, the scope of that implied easement was limited to the extent of use at the time of transfer. Keller further contends there is no substantial evidence to support the court's finding regarding the scope of the easement, and that the court's statement of decision fails to explain the factual and legal basis for such finding.

As we will explain, the record makes plain that there was no merger of the Keller and Donegan properties, and thus no extinguishment of the existing easement. Keller's claims regarding whether substantial evidence supports the court's finding as to the scope of the easement is forfeited for failure to provide an adequate record on appeal. Finally, we conclude the court's statement of decision is adequate. We therefore affirm the judgment.

2

FACTS AND PROCEEDINGS

In December 1969, members of the Coughlin family conveyed to John and Pamela Vantress, by grant deed, eight parcels of real property in the County of Nevada (hereafter, the 1969 Deed). The 1969 Deed reserved to the Coughlins "a non-exclusive right of way and easement 60-feet in width for road and utility purposes over and across all of the [eight parcels] for the benefit of and appurtenant to the [eight parcels] or any portion thereof" (hereafter, the easement or the easement roads).

On October 1, 1970, the Coughlins quitclaimed "[a]ll their right, title and interest in those certain 60 foot rights of way and easements 60 feet in width for road and utility purposes as reserved in the [1969 Deed]" to the Lone Star Lands Corporation (hereafter, the 1970 Deed). The 1970 Deed reserved to the Coughlins "a non-exclusive right of way 60 feet in width for road and utility purposes over the existing roads traversing the property described in [the 1969 Deed]," and stated, "The intent of this instrument is to establish the location of said 60 foot right of way as being over the existing roads only."

Donegan and Keller met in Montana sometime between 1999 and 2001. In late 2001, Donegan purchased a portion of Parcel No. 6 as described in the 1969 Deed, namely Lots 5 and 6 and the McCarthy Mine (collectively, the Donegan property), from then owners, Robert and Nanette Streiff, for $100,000. The northern half of the Donegan property was only accessible by vehicle via either of two easement roads--the upper road and the lower road--across the adjacent property directly to the north.

Donegan moved onto the Donegan property immediately. He lived on the Donegan property for the first few years, and spent a good deal of time constructing a foundation and a geodesic dome. During one summer, he stayed on the property in a camper bus with his daughter.

In 2001, Donegan used the easement roads to access the northern part of his property "more than once a day." In early 2002, he continued to use the easement roads

3

"on a daily basis sometimes two and three times a day back and forth to the hardware store into town to get materials." Donegan visited the property daily for months at a time, and took family and friends to visit the property, always using the easement roads to access his land.

In the latter half of 2002, Keller and Donegan verbally agreed to a joint venture--a gardening business--in which Keller invested approximately $50,000. For reasons not relevant to this dispute, the joint venture business never came to fruition. By the end of 2005, Donegan reimbursed Keller for all but $8,500 of the $50,000.

At some point in 2002 or 2003, the Streiffs offered to sell Donegan approximately 38 acres of property to the north of the Donegan property, in particular, a portion of Parcel No. 6 as described in the 1969 Deed, namely Lots 2, 3, and 47-B (collectively, the Keller property), for $82,500. Donegan contacted Keller to let him know the Keller property was for sale. Keller expressed an interest in purchasing the property and, in Summer or Fall 2003, Donegan drove Keller and his girlfriend, Jessica Knutson, to see the Keller property. They drove down to the creek and back up again using the upper easement road. They also travelled on the lower easement road, which at the time had no gate.

Donegan and Keller agreed that Donegan would purchase the Keller property from the Streiffs and hold the deed, while Keller would make all payments directly to the Streiffs. When payment was complete, Donegan would quitclaim the property to Keller.

Donegan testified that when he and Keller discussed the possible purchase of the Keller property, Donegan stated his intention "to continue using the [easement] roads permanently" and requested that he be given a right of first refusal should Keller ever sell the property. According to Donegan, Keller agreed to Donegan's continued use of the easement, and to give him the right of first refusal. At trial, Keller denied ever having those discussions. Keller testified he intended to maintain exclusive control over the easement roads irrespective of anything Donegan may have said about wanting to use

4

them. Keller further testified he "didn't know there was an easement" on his property, but he did know there were roads on the property when he and Donegan toured it prior to purchase.

In 2004, Donegan purchased the Keller property from the Streiffs as planned. The grant deed was silent as to the easement. Keller moved onto the property in May and built a small cabin and outhouse that summer. Donegan quitclaimed the Keller property to Keller on June 3, 2004, and filed a "correctory deed" on June 28, 2004. Both deeds were silent as to the easement.

The parties' accounts of what transpired from this point forward differ significantly. Donegan testified that, for a while after Keller moved onto the Keller property, he and Keller continued to socialize as friends. During that initial period, Donegan used the easement roads "many times" with his daughter. Between May 2004 and May 2006, he enjoyed unobstructed access to the northern portion of his property via the easement roads for "extensive" recreational use.

According to Donegan, in approximately May 2005, he and Keller agreed to have a gate installed on the lower easement road to protect both the Keller property and the Donegan property from unwanted intruders. Donegan enlisted the help of Nate Robinson to install the gate, for which Keller and Donegan each had a key. While Robinson was there, Donegan also had him regrade the easement roads.

Donegan testified that, on one occasion in 2005, he and a friend visiting from out of state used Donegan's key to unlock the gate across the upper easement road, then stopped and visited with Keller and Knutson before continuing down to Donegan's property, unobstructed by Keller. Donegan used both the upper and the lower easement roads on several occasions during the 2005-2006 timeframe, unobstructed by Keller.

According to Donegan, Keller changed the locks on the gates to the upper and lower easement roads in Spring 2008 and told Donegan, "I don't want you coming through here anymore." In May 2009, a confrontation occurred at the gate to the lower

5

easement road when Keller prevented Donegan from using the easement road to access a portion of the Donegan property in order to mill a downed tree and remove the lumber.

Keller testified he first began to inhibit Donegan's use of the easement roads in Fall 2005, when he "locked the lower gate and changed the locks." In 2005 or 2006, Donegan asked him several times for permission to use the easement roads to reclaim pipe on the Donegan property. Keller granted him permission. In 2007, when Donegan asked for the key to the gate so he could go down to the creek, Keller refused. In early-2009, Keller gave Donegan a $5,000 down payment to buy Donegan's property. According to Keller, when issues arose with the deal, Donegan threatened to sue him "for not allowing an easement through my [Keller's] land" so Donegan could sell the property to another potential buyer. Keller confirmed he cut off Donegan's use of the easement roads in part because he was angry and felt he had been "ripped off" and lied to by Donegan. He acknowledged that he did not like Donegan and did not care that Donegan had used the easement roads in the past. He also acknowledged he knew that by denying Donegan access to the easement roads, he was effectively cutting off all vehicular access to the northern portion of Donegan's property.

Keller filed a complaint for trespass and injunctive relief. Donegan cross-complained to quiet title and for other causes of action.

Following a bench trial, the court issued its statement of decision finding an easement in favor of Donegan, but expressly declining to define the scope of the easement. In the meantime, Keller filed written objections to the proposed statement of decision and proposed judgment prepared by Donegan (neither of which were made a part of the appellate record), and suggested that a hearing be held "to determine the historical use by [Donegan] of the easements he has been awarded."

The trial court issued an order setting aside its statement of decision and setting a hearing on Keller's objections. The hearing was not recorded. The court's minutes reflect that the matter was submitted following arguments by the parties. Thereafter, the

6

court issued its final statement of decision and again entered judgment in favor of Donegan, this time defining the scope of the easement as follows:  "It is hereby ordered that an easement exists in favor of Defendant Chris Donegan on the property owned and/or possessed by Plaintiff Gabriel Keller.  That easement is that described in the deed dated November 12, 1969, recorded December 5, 1969 in Book 496, Page 409, Official Records and as clarified in the deed dated September 29, 1970, in Book 529, Page 356, Official Records."  The judgment also awarded Donegan damages in the amount of $5,000, plus costs of suit.

Keller filed a timely notice of appeal.

# DISCUSSION

## I

### *Standard of Review*

In California, "[a] judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness. [Citations.]"  (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.)

Generally, appellate courts independently review questions of law and apply the substantial evidence standard to a superior court's findings on questions of fact.  (See *People v. Cromer* (2001) 24 Cal.4th 889, 893-894 [questions of law are subject to de novo review and questions of fact are reviewed under deferential substantial evidence standard].)

## II

### *No Extinguishment by Merger*

Keller contends the trial court erred by referring to the 1969 and 1970 Deeds to define the scope of the easement over Keller's property because any easement described in those historical deeds was extinguished when the two parcels came under common

7

ownership, that is, when title to the two parcels merged in the same person (Donegan). Keller contends the trial court found an easement was created by implication when the two parcels once again became separate and, as such, the scope of the implied easement should have been limited to the extent of use at the time of conveyance.

Donegan argues Keller's claim of extinguishment by merger fails because Donegan, merely a "strawman" through whom Keller acquired the property, never became the true owner of the Keller property. Hence, the scope of the easement is as expressly stated in the historical deeds.

As we will explain, the easement that existed prior to Donegan's purchase of the Keller property was not extinguished by merger.

We begin by defining the relevant terms. "[A]n easement is a nonpossessory ' "interest in the land of another that gives its owner the right to use the land of another or to prevent the property owner from using his land." ' [Citations.]" (*Kazi v. State Farm Fire & Casualty Co*. (2001) 24 Cal.4th 871, 880.) In contrast to fee simple property ownership, which provides the owner the right to the surface and to everything permanently situated beneath or above it, "an appurtenant easement is a burden on land that creates a right-of-way or the right to use the land only. (Civ. Code, § 801.) It represents a limited privilege to use the land of another for the benefit of the easement holder's land, but does not create an interest in the land itself. [Citations.]" (*Kazi, supra*, 24 Cal.4th at pp. 880-881.)

"The land to which an easement is attached is called the dominant tenement; the land upon which a burden or servitude is laid is called the servient tenement." (Civ. Code § 803.) "A servitude can be created only by one who has a vested estate in the servient tenement." (Civ. Code, § 804.) "A servitude thereon cannot be held by the owner of the servient tenement." (Civ. Code, § 805.)

8

The merger doctrine is codified in Civil Code section 811, which states, "A servitude is extinguished: [¶] 1. By the vesting of the right to the servitude and the right to the servient tenement in the same person . . . ."

"To extinguish an easement as far as all the dominant tenement is concerned, a complete merger is required . . . .[¶] . . . [¶] '[T]he ownership of the dominant and servient estates must be coextensive and equal in validity, quality, and all other characteristics.' " (*Leggio v. Haggerty* (1965) 231 Cal.App.2d 873, 881-882 (*Leggio*).) " 'In order that an easement will be extinguished under the doctrine of merger, there must be unity of title . . . . [T]he owner should have a permanent and enduring estate, an estate in fee, in both the dominant and servient estate, not liable to be disjoined again by operation of law. In any event, mere unity of possession is not enough. Further, the ownership of the two estates should be coextensive and equal in validity, quality, and all other circumstances of right.' " (*Id.* at pp. 883-884.)

" 'A merger occurs when a greater and lesser estate are held by the same person. In order to effect an extinguishment by merger, the title and ownership held in both tenements must be coextensive and equal in validity, quality, right to possession, and all other characteristics. [Fn. omitted.] The easement is not extinguished if the person has unequal title or rights in the servient and dominant tenements. [Fn. omitted.]' (6 Miller & Starr, Cal. Real Estate (3d ed.) Easements, § 15:75, pp. 232-233.)" (*Beyer v. Tahoe Sands Resort* (2005) 129 Cal.App.4th 1458, 1474.) Extinguishment by merger "does not occur unless the common owner has present possessory interests in both the dominant and servient estates." (*Zanelli v. McGrath* (2008) 166 Cal.App.4th 615, 629.)

We conclude there was no merger here. Donegan purchased the Donegan property in 2001 and lived on and used that property for a number of years. The record is clear that when the Streiffs offered to sell Donegan the adjacent Keller property, Donegan contacted Keller to let him know the property was for sale. After Donegan showed Keller the property, Keller confirmed he was interested in buying, and the two agreed that

9

Donegan would purchase the Keller property from the Streiffs, Keller would make all the payments, and Donegan would quitclaim the property to Keller when the debt was paid off.

In fact, both parties acted in accordance with their agreement. Donegan purchased the Keller property and, as confirmed by Keller at trial, acted as nothing more than a "strawman" or a "nominal holder" of the deed. Keller made all payments to the Streiffs. Donegan quitclaimed the property to Keller despite that Keller had nearly a year left until the Streiffs would be paid in full. Keller took physical possession of the Keller property almost immediately, whereas Donegan never took possession at all.

Donegan never had "the full and unlimited right and power to make any and every possible use of" the Keller property (*Leggio, supra,* 231 Cal.App.2d at p. 883) because the parties never intended that he would. While Donegan did, for awhile, hold a grant deed to the property, as Keller agrees, he did so only as a nominal owner or a strawman. As such, Donegan's title and ownership in the dominant estate (the Donegan property) and the servient estate (the Keller property) was neither coextensive nor equal in validity, quality, possession, or any other circumstance of right. Had Donegan attempted to treat the property as his own, Keller would no doubt have objected to Donegan's use of the property. The easement was therefore not extinguished by merger.

We similarly reject Keller's challenge to the trial court's reliance on the 1969 and 1970 Deeds to define the scope of the easement. The trial court admitted into evidence the 1969 Deed referencing the pre-existing easement, defined as a "non-exclusive right of way and easement 60-feet in width for road and utility purposes." It is worth noting that, in claiming the easement was extinguished by merger, Keller implicitly concedes the easement existed prior to Donegan's purchase of the Keller property. In any event, where, as here, the terms of the conveyance of the Keller property from the Streiffs to Donegan and then from Donegan to Keller did not expressly provide otherwise, the easement was incident to the Keller property and passed with it. (*Lemos v. Farmin*

10

(1932) 128 Cal.App. 195, 199.) In that regard, Donegan testified at length regarding his use of the easement roads in a manner consistent with their historical use, from and after the date he purchased the Donegan property and continuing after conveyance of the Keller property to Keller. While Keller disputed that fact, testifying Donegan rarely ever used the easement roads and even then only with Keller's permission, the trial court concluded otherwise, finding that "the prior existing use was ongoing and known to [Keller] prior to buying [the Keller property]." We conclude the court did not err in relying on the historical deeds to define the scope of the easement.

III

*Substantial Evidence*

Next, Keller contends there is no substantial evidence to support the trial court's finding that the scope of the easement was 60 feet wide and for road and utility purposes over all existing roads on Keller's property.

On a claim based on the sufficiency of the evidence, our review is limited to a determination of whether the record contains evidence of "ponderable legal significance" which, when coupled with all reasonable inferences therefrom, supports the judgment of the trial court. (*Beck Development Co.* v. *Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1203.)

Keller has failed to satisfy his obligation to provide an adequate record on appeal. The party challenging the judgment or order has the burden of showing error by an adequate record. (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574; *Estate of Davis* (1990) 219 Cal.App.3d 663, 670 & fn. 13.) An appellant "bears the burden to provide a record on appeal which affirmatively shows that there was an error below, and any uncertainty in the record must be resolved against the [appellant]." (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 549; accord *People v. $17,522.08 United States Currency* (2006) 142 Cal.App.4th 1076, 1084.) "Without the benefit of the entire record, we cannot say that

11

the evidence is insufficient to support the finding of [the trial court]. Every intendment is in favor of the findings and judgment of the court below, and in support thereof it will be presumed that the omitted evidence authorized the same unless there is something in the record to overcome the presumption." (*In re Silva* (1931) 213 Cal. 446, 448.)

In this case, there is no transcript of the hearing on Keller's objections to the court's initial statement of decision. The court's minute order, which simply states that arguments were presented and the matter was submitted, is of little help, as we do not know what the parties argued or what evidence, if any, they presented in support of, or opposition to, those arguments. This information is particularly important in light of the fact that the trial court's initial statement of decision declined to define the scope of the easement. In the absence of an adequate appellate record, we must presume the court's decision to define the scope of the easement by reference to the 1969 and 1970 Deeds was supported by the evidence.

IV

*Adequacy of Statement of Decision*

Lastly, Keller contends the trial court's statement of decision failed to address his objections to the scope of the easement. The claim lacks merit.

In a nonjury trial, the trial court is required to render a statement of decision on the timely request of a party, explaining the factual and legal basis for its decision as to each of the principal controverted issues for which the statement was requested. (Code Civ. Proc., § 632.) On appeal, the statement of decision provides a record of the trial court's reasoning on particular disputed issues, which the appellate court may review in determining whether the court's decision is supported by the evidence and the law. (*In re Marriage of Ditto* (1988) 206 Cal.App.3d 643, 647.)

Although a party may object to the statement of decision by raising numerous points of contention, the trial court is not required to respond point by point. "The court's

12

statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case. (*People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 525; *Republic Indemnity Co. v. Empire Builders Corp.* (1985) 167 Cal.App.3d 1163, 1167.)" (*Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1379-1380.) A statement of decision is "*not* required to address how it resolved intermediate evidentiary conflicts, or respond point by point to the various issues posed in appellant's request for a statement of decision." (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1125-1126.)

As identified by the trial court, the ultimate facts and material issues here revolve around one central question—whether and to what extent Donegan had "the right to use access roads over [Keller's] land to access portions of [Donegan's] land." The statement of decision reveals that, with respect to that core issue, the court found: Keller was aware of the existence of the easement roads and Donegan's use of those roads prior to his purchase of the Keller property; Keller was aware that without those easement roads, Donegan had no access to a portion of Donegan's property; Keller was aware that Donegan continued to use the easement roads up until the physical confrontation in 2008; and, Keller prevented Donegan from using the easement roads because Keller felt Donegan had "ripped [him] off" in their joint business venture and Keller was angry with Donegan, in addition to professing to lack of understanding of easements.

The court concluded the "historical nature of the paths or roads that run across [Keller's property]" to the otherwise inaccessible portion of Donegan's property, as well as the "circumstances of sale and the reasonable expectation of the[] parties," all supported the conclusion that the easements in existence prior to the sale (of which Keller knew or should have known) continued to exist after Keller's purchase of the Keller property, and that the historical definition of the pre-existing easement still applied to the easement at the time of trial. Hence, the scope of the easement was as described in the 1969 and 1970 Deeds.

13

The statement of decision fairly discloses the trial court's determination as to the ultimate facts and material issues in the case.

DISPOSITION

The judgment is affirmed. Respondent shall receive his costs on appeal. (Cal. Rules of Court, rule 8.278 (a)(5).)


                                          HULL                    , J.


We concur:



         NICHOLSON        , Acting P. J.



         ROBIE            , J.


14